UNITED STATES *v.* LINE MATERIAL CO. ET AL.

No. 8.   Argued April 29, 1947.   Reargued November 12–13, 1947.—
Decided March 8, 1948.

*Assistant Attorney General Berge* argued the cause on the original argument for the United States.   With him on the brief were *George T. Washington,* then Acting Solicitor General, *Charles H. Weston, Robert G. Seaks, Bartholomew A. Diggins* and *Leonard J. Emmerglick.*

*Frederick Bernays Wiener* argued the cause on the reargument for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett* and *Robert G. Seaks.*

*John Lord O'Brian* and *Albert R. Connelly* argued the cause for appellees. With them on the briefs were *Nester S. Foley, Gerhard A. Gesell, Louis Quarles, Maxwell H. Herriott, Clark J. A. Hazelwood, Charles F. Meroni, Needham A. Graham, Jr., W. F. Sonnekalb, Jr., Alexander C. Neave, Harry R. Puch, Jr., Wilder Lucas, Wilber Owen, John A. Dienner, Edward C. Grelle, George B. Turner* and *John J. O'Connell.*

MR. JUSTICE REED delivered the opinion of the Court.

The United States sought an injunction under §§ 1 and 4 of the Sherman Act[1] in the District Court against continuance of violations of that Act by an allegedly unlawful combination or conspiracy between appellees, through contracts, to restrain interstate trade in certain patented electrical devices. The restraint alleged arose from a cross-license arrangement between the patent owners, Line Material Company and Southern States Equipment Corporation, to fix the sale price of the devices,

---

[1] 26 Stat. 209, as amended by 36 Stat. 1167:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. . . ."

"Sec. 4. The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. . . ."

to which arrangement the other appellees, licensees to make and vend, adhered by supplemental contracts.[2]

The District Court, 64 F. Supp. 970, dismissed the complaint as to all defendants upon its conclusion that the rule of *United States* v. *General Electric Co.*, 272 U. S. 476, was controlling. That case approved as lawful a patentee's license to make and vend which required the licensee in its sales of the patented devices to conform to the licensor's sale price schedule. Appeal was taken directly to this Court, 32 Stat. 823, and probable jurisdiction noted here on October 21, 1946. We have jurisdiction.[3]

---

[2] The names of appellees and the abbreviations hereinafter used as well as the percentage of production of the dropout fuse devices manufactured under the patents are listed below:

| Appellee | Abbreviated title | Percent |
|---|---|---|
| General Electric Co. | General Electric | 29.2 |
| Line Material Co. | Line | 25.4 |
| James R. Kearney Corp. | Kearney | 18.9 |
| Southern States Equipment Corp. | Southern | 7.9 |
| Westinghouse Electric Corp. | Westinghouse | 5.3 |
| Schweitzer & Conrad, Inc. | Schweitzer & Conrad. | 5.1 |
| Railway & Industrial Engineering Co. | Railway | 3.8 |
| W. N. Matthews Corp. | Matthews | 2.0 |
| Porcelain Products Co. | Porcelain | 1.5 |
| Royal Electric Mfg. Co. | Royal | .5 |
| Pacific Electric Mfg. Co. | Pacific | .2 |
| T. F. Johnson | Johnson | .2 |

100.0

All are corporations of various states except T. F. Johnson, doing business as Johnson Manufacturing Company, Atlanta, Georgia.

[3] The case was argued April 29, 1947, and at our request reargued November 12–13, 1947. *United States* v. *United States Gypsum Co.*, decided today, *post*, p. 364, considers related phases of Sherman Act legislation.

## I. *The Facts.*

The challenged arrangements center around three product patents, which are useful in protecting an electric circuit from the dangers incident to a short circuit or other overload. Two of them are dropout fuse cutouts and the third is a housing suitable for use with any cutout. Dropout fuse cutouts may be used without any housing. The District Court found that 40.77% of all cutouts manufactured and sold by these defendants were produced under these patents. This was substantially all the dropout fuse cutouts made in the United States. There are competitive devices that perform the same functions manufactured by appellees and others under different patents than those here involved.

The dominant patent, No. 2,150,102, in the field of dropout fuse cutouts with double jointed hinge construction was issued March 7, 1939, to the Southern States Equipment Corporation, assignee, on an application of George N. Lemmon.[4] This patent reads upon a patent No. 2,176,227, reissued December 21, 1943, Re. 22,412, issued October 17, 1939 to Line Material Company, assignee, on an application by Schultz and Steinmayer.[5]

---

[4] ". . . The Lemmon device consists essentially of an expulsion tube supported by a double jointed hinge at its lower end. As the tube moves into closed circuit position, the hinge is locked and a latch engages a terminal on top of the tube to hold the tube in place. The hinge is released by a relatively complicated and expensive solenoid mechanism when the current becomes excessive because of a short circuit or overload. Thereupon the circuit is broken in the tube and the tube drops downwardly, its upper end disengaging from the latch, which permits the tube to swing out and down. By reason of claims covering the double jointed hinge construction in cutouts, this patent dominates the manufacture of dropout fuse cutouts involved in this suit." Findings of Fact, No. 6.

[5] ". . . The Schultz patent covers a dropout fuse cutout which is an improvement on the device disclosed in the Lemmon patent, and is dominated by the Lemmon patent. In the Schultz structure an

The housing patent No. 1,781,876, reissued March 31, 1931, as Re. 18,020, and again February 5, 1935, as Re. 19,449, was issued November 18, 1930 to Line, assignee, on an application by W. D. Kyle. The Kyle patent covers a wet-process porcelain box with great dielectric strength, which may be economically constructed and has been commercially successful. We give no weight to the presence of the Kyle patent in the licenses.

The applications for the Lemmon and Schultz patents were pending simultaneously. They were declared in interference and a contest resulted. The decision of the Patent Office awarding dominant claims to Southern and subservient claims to Line on the Lemmon and the Schultz applications made it impossible for any manufacturer to use both patents when later issued without some cross-licensing arrangement. Cf. *Temco Electric Motor Co.* v. *Apco Mfg. Co.*, 275 U. S. 319, 328. Only when both patents could be lawfully used by a single maker could the public or the patentees obtain the full benefit of the efficiency and economy of the inventions. Negotiations were started by Line which eventuated in the challenged arrangements.

The first definitive document was a bilateral, royalty-free, cross-license agreement of May 23, 1938, between Southern and Line after the Patent Office award but before the patents issued. This, so far as here pertinent, was a license to Southern by Line to make and vend the prospective Schultz patented apparatus with the exclusive

---

expulsion tube is supported by a double jointed hinge which is held rigid by a fuse link. On overload, the fuse melts, breaking the circuit in the tube and the hinge is released automatically, which permits the tube to drop down and then swing outwardly. This Schultz dropout fuse is much simpler, and can be manufactured at considerably less than the cost of a comparable solenoid operated cutout, and has met widespread commercial demand and use." Findings of Fact, No. 7.

right to grant licenses or sublicenses to others. Line also granted Southern the right to make and vend but not to sublicense the Kyle patent. Southern licensed Line to make and vend but not to sublicense the prospective Lemmon patent for defined equipment which included the Schultz apparatus. Sublicense royalties and expenses were to be divided between Line and Southern. Although a memorandum of agreement of January 12, 1938, between the parties had no such requirement, Line agreed to sell equipment covered by the Southern patent at prices not less than those fixed by Southern. Southern made the same agreement for equipment covered solely by the Line patent. No requirement for price limitation upon sales by other manufacturers under license was included.

Six of the other manufacturers [6] here involved were advised by Line by letter, dated June 13, 1938, that Southern had authority to grant licenses under the Schultz prospective patent. On October 3, 1938, Kearney took from Southern a license to practice the Lemmon and Schultz patents. The license had a price, term and condition of sale clause, governed by Southern's prices, which bound Kearney to maintain the prices on its sales of devices covered by the patents. On October 7, 1938, the five other manufacturers mentioned above were offered by Southern the same contract as the standard licensor's agreement. The Kearney contract was discussed at Chicago in October, 1938, by all of the above manufacturers except Railway. Pacific also participated. It never was enforced. The first patent involved in this case did not issue until March, 1939. Those manufacturers who were making double jointed open and enclosed dropout cutouts wanted to and did explore cooperatively

---

[6] Schweitzer & Conrad, General Electric, Westinghouse, Railway, Kearney, Matthews.

(F. F. 15) the validity of the patents. They failed to find a satisfactory basis for attack. They were faced with infringement suits. Other reasons developed for the refusal of the six manufacturers to accept the Kearney form contracts (F. F. 16 & 17) unnecessary to detail here. One reason was that the prospective sublicensees preferred Line to Southern as licensor because of the fact that Line, as owner and manufacturer, would license the Kyle patent. New arrangements were proposed for the licensees. After mutual discussion between the licensees and patentees, these new agreements were submitted. A finding to which no objection is made states:

> "On October 24, 1939, General Electric, Westinghouse, Kearney, Matthews, Schweitzer and Conrad, and Railway met with Line in Chicago and jointly discussed drafts of the proposed license agreements under the Lemmon, Schultz, and Kyle patents. Thereafter, identical sets of revised licenses were sent by Line to General Electric, Westinghouse, Matthews, Schweitzer and Conrad, and the attorneys for Railway and Kearney."

A form for a proposed licensing agreement that contained the essential elements of the price provision ultimately included in the licenses had been circulated among prospective licensees by Line by letters under date of October 6, 1939.

To meet the various objections of the future licensees, the agreement of May 23, 1938, between Southern and Line was revised as of January 12, 1940. Except for the substitution of Line for Southern as licensor of other manufacturers, it follows generally the form of the earlier agreement. There were royalty-free cross-licenses of the Schultz and Lemmon patents substantially as before. Line was given the exclusive right to grant sublicenses to

others for Lemmon.[7]  Southern retained the privilege, royalty free, of making and vending the Kyle patent, also. Southern bound itself to maintain prices, so long as Line required other licensees to do so.[8]  Even if it be assumed

[7] "The Southern Corporation grants to the Line Company a fully paid license to make, use and sell, with the exclusive right to grant sub-licenses to others to make, use and sell, expulsion tube electric circuit interrupting equipment in which the circuit interruption is caused by the thermally initiated rupturing of a current carrying element in an expulsion tube, coming under claims 3, 4 to 10, inclusive, 15 to 22 inclusive, 25, and 27 to 30 of the patent to G. N. Lemmon, No. 2,150,102, dated March 7, 1939, entitled "Circuit Breaker" and/or any division, continuation, substitute, renewal and/or reissue thereof."

[8] "15. The licenses hereby granted or agreed to be granted are on the express condition that the prices, terms and conditions of sale of the Southern Corporation for electric fuse equipment made and sold under the licenses herein granted shall, so long as such electric fuse equipment continues to be covered by Letters Patent of the Line Company under which a license is granted by this agreement, be not more favorable to the customer than those established from time to time and followed by the Line Company in making its sales.

"It is the purpose and intent of this agreement that there shall not be directly, or indirectly, any modification of the prices set by the Line Company as they exist from time to time, as for instance, by including in the transaction other material or parts, or labor, or services, at less than the regular prices at which the party making the same is at the time selling such other material or parts or furnishing such labor or services or by making allowances for freight or terms of payment other than those employed by the Line Company.

"Prices, terms and/or conditions of sale may be changed by the Line Company from time to time through reasonable notice in writing to the Southern Corporation, but not less than ten (10) days' written notice shall be given before the change shall go into effect.

"It is agreed that if the Line Company shall grant a license to a third party under any of the patents of this agreement (but excepting from the provisions of this paragraph a license to be granted to General Electric Company of Schenectady, New York, under said Kyle reissue patent 19,449), without a provision for maintenance by

that the proper interpretation of the Line-Southern agreement permitted Southern to manufacture under its own Lemmon patent without price control, the practical result is that Southern does have its price for its products fixed because the only commercially successful fabrication is under a combination of the Lemmon and Schultz patents. Findings of Fact 7 and 10.

The price maintenance feature was reflected in all the licenses to make and vend granted by Line, under the Line-Southern contract, to the other appellees. There were variations in the price provisions that are not significant for the issues of this case. A fair example appears below.[9] The execution of these sublicenses by the

---

said third party of prices, terms and conditions of sales as set forth in the first paragraph of this section, then Southern Corporation shall be relieved from its obligation under said section."

[9] In the Line-General Electric license agreement of March 15, 1940, the first under the revised Line-Southern contract, the price maintenance provision was as follows:

"9. The license hereby granted by the Licensor is subject to the express limitations that

as to dropout fuse cutouts manufactured and sold by Licensee which are comparable in respect to general type and purpose, ampere and voltage rating, and rupturing capacity, to dropout fuse cutouts manufactured and sold by Licensor,

Licensee's prices, terms and conditions of sale of dropout fuse cutouts

for use in the United States made under the license herein granted to Licensee under the aforesaid Letters Patent, Lemmon No. 2,150,102, and Schultz and Steinmayer No. 2,176,227, and as long as such dropout fuse cutouts continue to be covered by such Letters Patent,

shall be no more favorable to a customer of the Licensee than those established from time to time and followed by the Licensor in its sales. The prices, terms and conditions of sale as at present established and in force are those set forth in Schedule A annexed hereto and forming a part hereof. This schedule of prices may be changed

other appellees, except Johnson and Royal,[10] followed within a year. Licenses were executed by the two on June 15, 1943, and March 24, 1944, respectively. After August 1, 1940, since a number of the appellees had executed the license contracts, two consultations of the licensees and the patentees were held to classify the products of the various licensees in comparison with the licensor's devices.[11] The trial judge found that prices were not discussed. These were fixed by Line without discussion with or advice from any other appellee. There can be no doubt, however, that each licensee knew of the proposed price provisions in the licenses of other licensees from the circulation of proposed form of license on October 6, 1939, subsequent consultations among the licensees and an escrow agreement, fulfilled July 11, 1940. That

from time to time by the Licensor upon ten (10) days' notice in writing to the Licensee.

"10. The spirit and intent of this license agreement, contemplates that in no transaction shall there be any modification of Licensee's prices, either directly or indirectly, as for instance by inclusion in the transaction of other material or parts or services or labor at less than the regular prevailing prices at which the party making the sale is at the time accustomed to sell such other material or parts or furnish such services or labor, as will serve in effect to reduce Licensee's prices below those named in Schedule A as it exists from time to time."

This was repeated in the Line-General Electric revised agreement of November 17, 1941. A variable appears in the Westinghouse and other licenses. In its price provisions, the Lemmon patent is not mentioned but the Lemmon patent was included in its grant of license and the subsidiary Schultz patent could not be practiced without the right to use the dominant Lemmon.

[10] These two produced an aggregate of less than one percent of the devices.

[11] All appellees, except Royal, Pacific and Johnson, attended one or another of these conferences. We do not find it necessary to determine whether or not the selling prices also of the licensees were before the conference. The agreements adequately show an intention to fix prices.

agreement was entered into after General Electric took its license and required for fulfillment the acceptance of identical licenses by Matthews, Kearney and Railway. The licenses that were the subject of the escrow contained the price provisions of General Electric's license. This awareness by each signer of the price provisions in prior contracts is conceded by appellees' brief. A price schedule became effective January 18, 1941. Thereafter, all the appellees tried to maintain prices. Where there was accidental variation, Line wrote the licensee calling attention to the failure.[12]

The licenses were the result of arm's length bargaining in each instance. Price limitation was actively opposed *in toto* or restriction of its scope sought by several of the licensees, including General Electric, the largest producer of the patented appliances. A number tried energetically to find substitutes for the devices. All the licensees, however, were forced to accept the terms or cease manufacture. By accepting they secured release from claims for past infringement through a provision to that effect in the license. The patentees through the licenses sought system in their royalty collections and pecuniary reward for their patent monopoly. Undoubtedly one purpose of the arrangements was to make possible the use by each manufacturer of the Lemmon and Schultz patents. These patents in separate hands produced a deadlock. Lemmon by his basic patent "blocked" Schultz's improvement. Cross-licenses furnished appellees a solution.

On consideration of the agreements and the circumstances surrounding their negotiation and execution, the District Court found that the arrangements, as a whole, were made in good faith, to make possible the manufacture by all appellees of the patented devices, to gain a legiti-

---

[12] The licenses contained provisions for records of sale, inspection thereof and cancellation of the license for breach.

mate return to the patentees on the inventions; and that, apart from the written agreements, there was no undertaking between the appellees or any of them to fix prices.[13] Being convinced, as we indicated at the first of this opinion, that the *General Electric* case controlled and permitted such price arrangements as are disclosed in

[13] Findings of Fact:

"32. The price limitation provisions contained in the various license agreements here in evidence were insisted upon by the patent owner and were intended and reasonably adapted to protect its own business and secure pecuniary reward for the patentee's monopoly. Each of the licenses granted to the licensee-defendants was taken and granted in good faith, the parties to the licenses believing a license under the patents to be necessary in order that the licensee could continue lawfully to manufacture and sell its dropout fuse cutouts. Apart from the written license agreements here in evidence, there was no agreement, express or implied, between the licensor and any licensee, or between any two or more licensees, with respect to the prices of licensed dropout fuse cutouts.

"33. All of the devices for which minimum prices were established by Line were comparable to, and competitive with, devices which Line manufactured and sold regularly or which it was ready to manufacture and sell to its customers on special order.

"34. The cross-license agreements between Line and Southern were limited to the commercially practicable device covered by the subservient Schultz patent, and did not create additional power for price control of the licensed cutouts over that which each had before entering into the agreements. The inflexible intention to insist upon price limitation existed independently in each of the patent owners prior to any discussions or arrangements between them. Such cross-license agreements were entered into in good faith, not for the purpose of fixing prices in the industry but to permit the manufacture and sale of the cheaper device covered by the subservient patent, to facilitate the negotiation of licenses, and to provide royalty income. There was no agreement, express or implied, between Line and Southern with respect to prices on cutouts other than the written cross-license agreements.

"35. The license agreements here in evidence did not restrain trade but promoted it by making available several sources where the patented devices could be obtained, thus increasing competition in such

the contracts, the District Court dismissed the complaint. The Government attacks the rationale of the *General Electric* case and urges that it be overruled, limited and explained or differentiated.

## II. *The General Electric Case.*

That case was decided in 1926 by a unanimous Court, Chief Justice Taft writing. It involved a bill in equity to enjoin further violations of the Sherman Act. While violations of the Act by agreements fixing the resale price of patented articles (incandescent light bulbs) sold to dealers also were alleged in the bill, so far as here material the pertinent alleged violation was an agreement between General Electric and Westinghouse Company through which Westinghouse was licensed to manufacture lamps under a number of General Electric's patents, including a patent on the use of tungsten filament in the bulb, on condition that it should sell them at prices fixed by the licensor. On considering an objection to the fixing of prices on bulbs with a tungsten filament, the price agreement was upheld as a valid exercise of patent rights by the licensor.

Speaking of the arrangement, this Court said: "If the patentee . . . licenses the selling of the articles [by a licensee to make], may he limit the selling by limiting the method of sale and the price? We think he may do so, provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly." P. 490. This proviso must be read as directed at agreements between a patentee and a licensee

devices, particularly with respect to design, quality and service. Competition among the defendants for business in these devices continued to be vigorous after the making of the license agreements.

"36. There was no combination or conspiracy among the defendants, or any of them, to fix, maintain or control prices of dropout fuse cutouts or parts thereof, or to restrain trade or commerce therein."

to make and vend. The original context of the words just quoted makes clear that they carry no implication of approval of all a patentee's contracts which tend to increase earnings on patents. The opinion recognizes the fixed rule that a sale of the patented article puts control of the purchaser's resale price beyond the power of the patentee. P. 489. Compare *United States* v. *Univis Lens Co.*, 316 U. S. 241. Nor can anything be found in the *General Electric* case which will serve as a basis to argue otherwise than that the precise terms of the grant define the limits of a patentee's monopoly and the area in which the patentee is freed from competition of price, service, quality or otherwise. Compare *Mercoid Corporation* v. *Mid-Continent Inv. Co.*, 320 U. S. 661, 665, 666; *United States* v. *Masonite Corp.*, 316 U. S. 265, 277–78, 280; *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502, 510.

*General Electric* is a case that has provoked criticism and approval. It had only bare recognition in *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 456. That case emphasized the rule against the extension of the patent monopoly, p. 456, to resale prices or to avoid competition among buyers. Pages 457–58. We found it unnecessary to reconsider the rule in *United States* v. *Masonite Corp.,* 316 U. S. 265, 277, although the arrangement there was for sale of patented articles at fixed prices by dealers whom the patentee claimed were *del credere* agents. As we concluded the patent privilege was exhausted by a transfer of the articles to certain agents who were part of the sales organization of competitors, discussion of the price-fixing limitation was not required. In *Katzinger Co.* v. *Chicago Mfg. Co.,* 329 U. S. 394, 398, where a suit was brought to recover royalties on a license with price limitations, this Court refused to examine the *General Electric* rule because of the claimed illegality of the Katzinger patent. If the patent were invalid, the price-fixing

agreement would be unlawful. We affirmed the action of the Circuit Court of Appeals in remanding the case to the District Court to determine the validity of the patent. The *General Electric* case was cited with approval in *Carbice Corp.* v. *American Patents Development Corp.*, 283 U. S. 27, 31. Other courts have explained or distinguished the *General Electric* rule.[14] As a reason for asking this Court to reexamine the rule of the *General Electric* case, the Government states that price maintenance under patents through various types of agreements is involved in certain pending cases.[15] Furthermore, the

---

[14] For illustration and without implication as to this Court's position on the issues, we call attention to the following:

*Barber-Colman Co.* v. *National Tool Co.*, 136 F. 2d 339. In a suit by the licensor against the licensee, injunctive relief to compel compliance with a price-fixing provision in the patent license was denied. The *General Electric* case was held not to permit the patentee to fix prices on unpatented hobs which were produced under a process patent by a patented machine.

*Cummer-Graham Co.* v. *Straight Side Basket Corp.*, 142 F. 2d 646. Licensee was denied relief in an action against licensor for failing to require other licensees to comply with price-fixing provisions; licensor of a patent on an attachment to a basket-making machine may not fix prices on baskets produced by the machine.

*United States* v. *Vehicular Parking, Ltd.*, 54 F. Supp. 828. Antitrust proceeding against patent holding company and manufacturing licensees in parking meter industry. The patent licenses fixed the prices at which parking meters could be sold and contained restrictive provisions on marketing practices. In ordering compulsory licensing at a reasonable royalty, the court distinguished the *General Electric* case principally on the ground that the patentee in this case did not itself manufacture the parking meters; other distinctions noted were the number and active concert of licensees, the weakness of the patents, the fixing of prices on unpatented articles, and the existence of marketing restrictions.

[15] For example, such price arrangements under the type of agreement indicated are in litigation as follows:

*United States* v. *Allegheny Ludlum Steel Corp.*, D. N. J. Civil 45–83, stainless steel company owning patents on a particular type of stain-

point is made that there is such a "host of difficult and unsettled questions" arising from the *General Electric* holding that the simplest solution is to overrule the prece-

---

less steel allegedly issued licenses fixing prices on all types of stainless steel.

*United States* v. *American Optical Co.*, S. D. N. Y. Civil 10–391, optical patents owned by patent holding company which gave exclusive licenses; exclusive licensee sublicensed to other manufacturers who agreed to maintain prices and comply with marketing restrictions.

*United States* v. *Bausch & Lomb Optical Co.*, S. D. N. Y. Civil 10–394, patent holding company issued licenses to two licensees to manufacture bifocal lenses, the licenses fixing prices at which the bifocal lenses were to be sold and the selection of wholesalers and retailers for the lenses.

*United States* v. *Catalin Corporation of America*, D. N. J. Civil 7743, manufacturer of phenolic resins licensed other manufacturers under its process patents, the licensees agreeing to sell at prices established by the licensor.

*United States* v. *General Cable Corp.*, S. D. N. Y. Civil 40–76, cross licenses among holders of patents on fluid filled cable, the licensees agreeing to adhere to uniform prices and to observe territorial marketing limitations.

*United States* v. *General Electric Co.*, D. N. J. Civil 1364, cross-licensing agreements between manufacturers of electrical bulbs providing for price and quantitative restrictions.

*United States* v. *General Electric Co.*, *Fried. Krupp*, S. D. N. Y. Cr. 110–412, cross-licensing of tungsten carbide patents with price and territorial restrictions.

*United States* v. *General Instrument Corp.*, D. N. J. Cr. 3960–C, Civil 8586, owners of variable condenser patents assigned patents to holding company and took back licenses with price-fixing provisions; explicit price-fixing provisions subsequently removed but allegedly continued by tacit agreement.

*United States* v. *Phillips Screw Co.*, N. D. Ill. Civil 47–C–147, holder of patents on cross recessed head screws granted exclusive license to leading screw manufacturer who sublicensed to other manufacturers; patent holder, exclusive licensee, and sublicensees agreed on price terms for all screws produced.

dent on the power of a patentee to establish sale prices of a licensee to make and vend a patented article.[16]

Such a liquidation of the doctrine of a patentee's power to determine a licensee's sale price of a patented article would solve problems arising from its adoption. Since 1902, however, when *Bement* v. *National Harrow Co.*, 186 U. S. 70, was decided, a patentee has been able to control his licensee's sale price within the limits of the patent monopoly.[17] Litigation that the rule has engendered proves that business arrangements have been repeatedly, even though hesitatingly, made in reliance upon the contractors' interpretation of its meaning. Appellees urge that Congress has taken no steps to modify the rule.[18] Such legislative attitude is to be weighed with the counterbalancing fact that the rule of the *General Electric* case grew out of a judicial determination.

---

[16] The United States lists: Uncertainty as to the nature of the patent, process or product, which justifies price control; extent of patent domination over the device; may a patent pooling corporation control all licensees' sale prices; extent of price control in an industry. U. S. Brief 65 *et seq.*

[17] In earlier cases involving the National Harrow Company the lower courts held that an industry-wide combination to fix prices was illegal. *National Harrow Co.* v. *Hench*, 83 F. 36; *National Harrow Co.* v. *Quick*, 67 F. 130, *affirmed on other grounds,* 74 F. 236. Compare *Rubber Tire Wheel Co.* v. *Milwaukee Rubber Works Co.*, 154 F. 358, and *Indiana Manufacturing Co.* v. *J. I. Case Threshing Machine Co.*, 154 F. 365, upholding industry-wide price fixing, with *Blount Manufacturing Co.* v. *Yale & Towne Manufacturing Co.*, 166 F. 555, holding such price fixing illegal.

[18] Bills have been introduced which would outlaw price limitation in patent licenses: H. R. 22345, 62d Cong., 2d Sess. (1912); S. 2730, 77th Cong., 2d Sess. (1942); S. 2491, 77th Cong., 2d Sess. (1942), and Hearings thereon; H. R. 7713, 77th Cong., 2d Sess. (1942); H. R. 109, 78th Cong., 1st Sess. (1943); H. R. 1371, 78th Cong., 1st Sess. (1943); H. R. 3874, 78th Cong., 1st Sess. (1943); H. R. 97, 79th Cong., 1st Sess. (1945); H. R. 3462, 79th Cong., 1st Sess. (1945);

The writer accepts the rule of the *General Electric* case as interpreted by the third subdivision of this opinion. As a majority of the Court does not agree with that position, the case cannot be reaffirmed on that basis. Neither is there a majority to overrule *General Electric*. In these circumstances, we must proceed to determine the issues on the assumption that *General Electric* continues as a precedent. Furthermore, we do not think it wise to undertake to explain, further than the facts of this case require, our views as to the applicability of patent price limitation in the various situations listed by the Government. On that assumption where a conspiracy to restrain trade or an effort to monopolize is not involved, a patentee may license another to make and vend the patented device with a provision that the licensee's sale price shall be fixed by the patentee. The assumption is stated in this way so as to leave aside the many variables of the *General Electric* rule that may arise. For example, there may be an aggregation of patents to obtain dominance in a patent field, broad or narrow, or a patent may be used as a peg upon which to attach contracts with former or prospective competitors, touching business relations other than the making and vending of patented devices. Compare *United States* v. *United States Gypsum Co., post,* p. 364, decided today; *United States* v. *Masonite Corp.,* 316 U. S. 265.

It may be helpful to specify certain points that either are not contested or are not decided in this case. The agreements, if illegal, restrain interstate commerce contrary to the Sherman Act. No issue of monopoly is

S. 2482, 79th Cong., 2d Sess. (1946); S. 72, 80th Cong., 1st Sess. (1947).

See Final Report of Temporary National Economic Committee, Sen. Doc. No. 35, 77th Cong., 1st Sess. (1941), p. 36; Report of the National Patent Planning Commission, H. R. Doc. No. 239, 78th Cong., 1st Sess. (1943), p. 9.

involved. (F. F. 31.) Cf. *American Tobacco Co.* v. *United States,* 328 U. S. 781, 788. That is to say, the complaint charges restraint of trade under § 1 and does not charge "monopoly" under § 2 of the Sherman Act, so that we need not deal with the problems of consolidation, merger, purchase of competitors or size of business as tending toward attaining monopoly. See *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32, 44–55; *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 427–31; *United States* v. *American Tobacco Co.,* 221 U. S. 106, 181–83; *United States* v. *United States Steel Corp.,* 251 U. S. 417, 451. We are not dealing with a charge of monopoly or restraint because of the aggregation of patents, by pooling or purchase, by an owner or owners, in a single industry or field. See *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32. Within the limits of the patentee's rights under his patent, monopoly of the process or product by him is authorized by the patent statutes. It is stipulated by the United States that the validity of the patents is not in issue. With these points laid aside, we proceed to the issues presented by this record.

### III. *The Determination of the Issue.*

Under the above-mentioned assumption as to *General Electric,* the ultimate question for our decision on this appeal may be stated, succinctly and abstractly, to be as to whether in the light of the prohibition of § 1 of the Sherman Act, note 1, *supra,* two or more patentees in the same patent field may legally combine their valid patent monopolies to secure mutual benefits for themselves through contractual agreements, between themselves and other licensees, for control of the sale price of the patented devices.

The appellees urge that the findings of the District Court, quoted in note 13 *supra,* stand as barriers to a con-

clusion here that § 1 of the Sherman Act has been violated by the licenses. Since there was material evidence to support the District Court's finding of the evidentiary facts and the Court necessarily weighed the credibility of the witnesses and the probative value of their testimony to establish appellees' contentions, appellees insist that the inferences or conclusions as to violations of the Sherman Act, drawn by the District Court, must be accepted by us.[19] As to the evidentiary facts heretofore stated, there is no dispute. From them the District Court made findings of fact Nos. 32 to 36, inclusive, hereinbefore set out in note 13. Even though we accept, as we do, these findings on preliminary facts as correct, the last sentence in findings 32 and 34 crumbles their asserted bar to an examination by us as to whether the agreements are violative of the Sherman Act. Those sentences are to the effect that there was an agreement to fix prices between all parties in the language of the contracts as set out in notes 8 and 9 *supra*. If the patent rights do not empower the patentees to fix sale prices for others, the agreements do violate the Act. The previous summary in this opinion of the agreements which compose these arrangements demonstrates that the agreements were intended to and did fix prices on the patented devices. Compare *Interstate Circuit* v. *United States*, 306

---

[19] Rules of Civil Procedure, Rule 52:

*Findings by the Court.*—"(a) EFFECT. In all actions tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court."

U. S. 208, 226.   While Line's sublicenses to others than
General Electric, note 9, gave to Line the power which
it exercised to fix prices only for devices embodying its
own Schultz patent, the sublicense agreements licensed
the use of the dominant Lemmon patent.   As the Schultz
patent could not be practiced without the Lemmon, the
result of the agreement between Southern and Line for
Line's sublicensing of the Lemmon patent was to combine
in Line's hands the authority to fix the prices of the com-
mercially successful devices embodying both the Schultz
and Lemmon patents.   Thus, though the sublicenses in
terms followed the pattern of *General Electric* in fixing
prices only on Line's own patents, the additional right
given to Line by the license agreement of January 12,
1940, between Southern and Line, to be the exclusive
licensor of the dominant Lemmon patent, made its price
fixing of its own Schultz devices effective over devices
embodying also the necessary Lemmon patent.   See note
9.   By the patentees' agreement the dominant Lemmon
and the subservient Schultz patents were combined to
fix prices.   In the absence of patent or other statutory [20]
authorization, a contract to fix or maintain prices in
interstate commerce has long been recognized as illegal
*per se* under the Sherman Act.[21]   This is true whether

[20] *E. g.*, Miller-Tydings Act, 50 Stat. 693.

[21] *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373; *Boston Store* v. *American Graphophone Co.*, 246 U. S. 8; *United States* v. *United Shoe Machinery Co.*, 247 U. S. 32, 58; *United States* v. *Trenton Potteries Co.*, 273 U. S. 392; *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 222–24; *United States* v. *Univis Lens Co.*, 316 U. S. 241, 250; *Sola Electric Co.* v. *Jefferson Electric Co.*, 317 U. S. 173; *Katzinger Co.* v. *Chicago Mfg. Co.*, 329 U. S. 394.

*Appalachian Coals* v. *United States*, 288 U. S. 344, cannot be cited to support a contrary view.   In that case, this Court held that "The plan cannot be said either to contemplate or involve the fixing of market prices."   P. 373.   See the *Socony-Vacuum* case, *supra,* 214 *et seq.*   Perhaps arbitrary or monopoly prices were in mind in Appalachian.   Pp. 358, 359, 365, 371.

the fixed price is reasonable or unreasonable. It is also true whether it is a price agreement between producers for sale or between producer and distributor for resale.

It is equally well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly.[22] By aggregating patents in one control, the holder of the patents cannot escape the prohibitions of the Sherman Act. See *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20; *United States* v. *United States Gypsum Co., post,* p. 364. During its term, a valid patent excludes all except its owner from the use of the protected process or product. *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32, 58; *Special Equipment Co.* v. *Coe,* 324 U. S. 370, 378. This monopoly may be enjoyed exclusively by the patentee or he may assign the patent "or any interest therein" to others. Rev. Stat. § 4898, as amended 55 Stat. 634. As we have pointed out, a patentee may license others to make and vend his invention and collect a royalty therefor. Thus we have a statutory monopoly by the patent and by the Sherman Act a prohibition, not only of monopoly or attempt to monopolize, but of every agreement in restraint of trade. Public policy has condemned monopolies for centuries. *The Case of Monopolies, Darcy* v. *Allein,* 11 Co. Rep. 84–b. See *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 428–49. See Employment Act of 1946, § 2, 60 Stat. 23. Our Constitution allows patents. Art. I, § 8, cl. 8. The progress of our economy has often been said to owe much to the stimulus

---

[22] *United States* v. *National Lead Co.,* 332 U. S. 319; *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 406; *Standard Oil Co.* v. *United States,* 283 U. S. at 169 and cases cited; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 48–49. See *Transparent-Wrap Machine Corp.* v. *Stokes & Smith Co.,* 329 U. S. 637, 641, 647, and cases cited.

to invention given by the rewards allowed by patent legislation. The Sherman Act was enacted to prevent restraints of commerce but has been interpreted as recognizing that patent grants were an exception. *Bement* v. *National Harrow Co., supra,* 92, 21 Cong. Rec. 2457. Public service organizations, governmental and private, aside, our economy is built largely upon competition in quality and prices. *Associated Press* v. *United States,* 326 U. S 1, 12–14. Validation by Congress of agreements to exclude competition is unusual.[23] Monopoly is a protean threat to fair prices. It is a tantalizing objective to any business compelled to meet the efforts of competitors to supply the market. Perhaps no single fact manifests the power and will to monopolize more than price control of the article monopolized. There can be no clearer evidence of restraint of trade. Whatever may be the evil social effect of cutthroat competition on producers and consumers through the lowering of labor standards and the quality of the produce and the obliteration of the marginal to the benefit of the surviving and low-cost producers, the advantages of competition in opening rewards to management, in encouraging initiative, in giving labor in each industry an opportunity to choose employment conditions and consumers a selection of product and price, have been considered to overbalance the disadvantages. The strength of size alone, the disappearance of small business are ever-present dangers in competition. Despite possible advantages to a stable economy from efficient cartels with firm or fixed prices for products, it is crystal clear from the legislative history and accepted judicial interpreta-

---

[23] The Interstate Commerce Act authorizes carriers to pool revenues and authorizes mergers of carriers, provided that approval of the Interstate Commerce Commission is obtained. The antitrust laws are inapplicable to such agreements. 49 U. S. C. § 5 (1), (2) and (11).

tions of the Sherman Act that competition on prices is the rule of congressional purpose and that, where exceptions are made, Congress should make them. The monopoly granted by the patent laws is a statutory exception to this freedom for competition and consistently has been construed as limited to the patent grant. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 452, 455; *United States* v. *Univis Lens Co.,* 316 U. S. 241; *Hartford-Empire Co.* v. *United States,* 323 U. S. 386. It is not the monopoly of the patent that is invalid. It is the improper use of that monopoly.

The development of patents by separate corporations or by cooperating units of an industry through an organized research group is a well known phenomenon. However far advanced over the lone inventor's experimentation this method of seeking improvement in the practices of the arts and sciences may be, there can be no objection, on the score of illegality, either to the mere size of such a group or the thoroughness of its research. It may be true, as Carlyle said, that "Genius is an infinite capacity for taking pains." Certainly the doctrine that control of prices, outside the limits of a patent monopoly, violates the Sherman Act is as well understood by Congress as by all other interested parties.

We are thus called upon to make an adjustment between the lawful restraint on trade of the patent monopoly and the illegal restraint prohibited broadly by the Sherman Act. That adjustment has already reached the point, as the precedents now stand, that a patentee may validly license a competitor to make and vend with a price limitation under the *General Electric* case and that the grant of patent rights is the limit of freedom from competition under the cases first cited at note 22.

With the postulates in mind that price limitations on patented devices beyond the limits of a patent monopoly violate the Sherman Act and that patent grants are to be

construed strictly, the question of the legal effect of the price limitations in these agreements may be readily answered. Nothing in the patent statute specifically gives a right to fix the price at which a licensee may vend the patented article. 35 U. S. C. §§ 40, 47. While the *General Electric* case holds that a patentee may, under certain conditions, lawfully control the price the licensee of his several patents may charge for the patented device, no case of this Court has construed the patent and anti-monopoly statutes to permit separate owners of separate patents by cross-licenses or other arrangements to fix the prices to be charged by them and their licensees for their respective products. Where two or more patentees with competitive, non-infringing patents combine them and fix prices on all devices produced under any of the patents, competition is impeded to a greater degree than where a single patentee fixes prices for his licensees. The struggle for profit is less acute. Even when, as here, the devices are not commercially competitive because the sub-servient patent cannot be practiced without consent of the dominant, the statement holds good. The stimulus to seek competitive inventions is reduced by the mutually advantageous price-fixing arrangement. Compare, as to acts by a single entity and those done in combination with others, *Swift & Co.* v. *United States,* 196 U. S. 375, 396; *United States* v. *Reading Co.,* 226 U. S. 324, 357; *Eastern States Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600; *Binderup* v. *Pathé Exchange,* 263 U. S. 291. The merging of the benefits of price fixing under the patents restrains trade in violation of the Sherman Act in the same way as would the fixing of prices between producers of nonpatentable goods.

If the objection is made that a price agreement between a patentee and a licensee equally restrains trade, the answer is not that there is no restraint in such an arrangement but, when the validity of the *General Electric* case

is assumed, that reasonable restraint accords with the patent monopoly granted by the patent law. Where a patentee undertakes to exploit his patent by price fixing through agreements with anyone, he must give consideration to the limitations of the Sherman Act on such action. The patent statutes give an exclusive right to the patentee to make, use and vend and to assign any interest in this monopoly to others. The *General Electric* case construes that as giving a right to a patentee to license another to make and vend at a fixed price. There is no suggestion in the patent statutes of authority to combine with other patent owners to fix prices on articles covered by the respective patents. As the Sherman Act prohibits agreements to fix prices, any arrangement between patentees runs afoul of that prohibition and is outside the patent monopoly.

We turn now to the situation here presented of an agreement where one of the patentees is authorized to fix prices under the patents. The argument of respondents is that if a patentee may contract with his licensee to fix prices, it is logical to permit any number of patentees to combine their patents and authorize one patentee to fix prices for any number of licensees. In this present agreement Southern and Line have entered into an arrangement by which Line is authorized to and has fixed prices for devices produced under the Lemmon and Schultz patents. It seems to us, however, that such argument fails to take into account the cumulative effect of such multiple agreements in establishing an intention to restrain. The obvious purpose and effect of the agreement was to enable Line to fix prices for the patented devices. Even where the agreements to fix prices are limited to a small number of patentees, we are of the opinion that it crosses the barrier erected by the Sherman

Act against restraint of trade though the restraint is by patentees and their licensees.

As early as 1912, in *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, this Court unanimously condemned price limitation under pooled [24] patent licenses.[25] As the arrangement was coupled with an agreement for limitation on jobbers' resale prices, the case may be said to be indecisive on patent license agreements for price control of a product without the jobber's resale provision. No such distinction appears in the opinion. This Court has not departed from that condemnation of price fixing. Even in *Standard Oil Co.* v. *United States,* 283 U. S. 163, where an arrangement by which the patentees pooled their oil cracking patents and divided among themselves royalties from licensees fixed by the pooling contracts was upheld, the theory was reiterated that a price limitation for the product was unlawful *per se.* Pp. 170, 173, 175. Of course, if a purpose or plan to monopolize or restrain trade is found, the arrangement is unlawful.

---

[24] The words "patent pool" are not words of art. The expression is used in this opinion to convey the idea of a linking of the right to use patents issued to more than one patentee.

[25] 226 U. S. at 48:

"The agreements clearly, therefore, transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law. It had, therefore, a purpose and accomplished a result not shown in the *Bement Case.* There was a contention in that case that the contract of the National Harrow Company with Bement & Sons was part of a contract and combination with many other companies and constituted a violation of the Sherman law, but the fact was not established and the case was treated as one between the particular parties, the one granting and the other receiving a right to use a patented article with conditions suitable to protect such use and secure its benefits. And there is nothing in *Henry* v. *A. B. Dick Co.,* 224 U. S. 1, which contravenes the views herein expressed."

P. 174. The Government's contention in that case that the limitation on royalties in itself violated the Sherman Act by fixing an element in the price was dismissed because the Court was of the view that controlled royalties were effective as price regulators only when the patentees dominated the industry. P. 174. This domination was thought by this Court not to have been proven.

When a plan for the patentee to fix the sale prices of patented synthetic hardboard on sales made through formerly competing manufacturers and distributors, designated as *del credere* agents,[26] came before this Court on allegations that the plan was in violation of the Sherman Act, we invalidated the scheme. We said that the patentee could not use its competitor's sales organization as its own agents so as to control prices. The patent monopoly, under such circumstances, we said, was exhausted on disposition of the product to the distributor. We reasoned that such an arrangement was a restriction on our free economy, "a powerful inducement to abandon competition," and that it derogated "from the general law [against price limitation] beyond the necessary requirements of the patent statute." *United States* v. *Masonite Corp.,* 316 U. S. 265, 281, 280.

We think that this general rule against price limitation clearly applies in the circumstances of this case. Even if a patentee has a right in the absence of a purpose to restrain or monopolize trade, to fix prices on a licensee's sale of the patented product in order to exploit properly his invention or inventions, when patentees join in an agreement as here to maintain prices on their several products, that agreement, however advantageous it may be to stimulate the broader use of patents, is unlawful *per se* under the Sherman Act. It is more than an exploitation of patents. There is the vice that patentees

---

[26] Cf. *United States* v. *General Electric Co., supra.*

have combined to fix prices on patented products. It is not the cross-licensing to promote efficient production which is unlawful. There is nothing unlawful in the requirement that a licensee should pay a royalty to compensate the patentee for the invention and the use of the patent. The unlawful element is the use of the control that such cross-licensing gives to fix prices. The mere fact that a patentee uses his patent as whole or part consideration in a contract by which he and another or other patentees in the same patent field arrange for the practice of any patent involved in such a way that royalties or other earnings or benefits from the patent or patents are shared among the patentees, parties to the agreement, subjects that contract to the prohibitions of the Sherman Act whenever the selling price, for things produced under a patent involved, is fixed by the contract or a license authorized by the contract. Licensees under the contract who as here enter into license arrangements, with price-fixing provisions, with knowledge of the contract, are equally subject to the prohibitions.

The decree of the District Court is reversed and the case is remanded for the entry of an appropriate decree in accordance with this opinion.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join, concurring.

While I have joined in the opinion of the Court, its discussion of the problem is for me not adequate for a full understanding of the basic issue presented. My view comes to this—it is a part of practical wisdom and good law not to permit *United States* v. *General Electric Co.*,

272 U. S. 476, to govern this situation, though if its premise be accepted, logic might make its application to this case wholly defensible. But I would be rid of *United States* v. *General Electric Co.* My reasons for overruling it start with the Constitution itself.

The Constitution grants Congress the power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, Cl. 8. It is to be noted first that all that is secured to inventors is "the exclusive right" to their inventions; and second that the reward to inventors is wholly secondary, the aim and purpose of patent statutes being limited by the Constitution to the promotion of the progress of science and useful arts. *United States* v. *Masonite Corp.*, 316 U. S. 265, 278 and cases cited.

Congress, faithful to that standard, has granted patentees only the "exclusive right to make, use, and vend the invention or discovery." Rev. Stat. § 4884, 35 U. S. C. § 40. And as early as 1853 the Court, speaking through Chief Justice Taney, defined the narrow and limited monopoly granted under the statutes as follows: "The franchise which the patent grants, consists altogether in the right to exclude every one ·from making, using, or vending the thing patented, without the permission of the patentee." *Bloomer* v. *McQuewan*, 14 How. 539, 549. But the ingenuity of man has conceived many ways to graft attractive private perquisites onto patents. The effort through the years has been to expand the narrow monopoly of the patent. The Court, however, has generally been faithful to the standard of the Constitution, has recognized that the public interest comes first and reward to inventors second, and has refused to let the self-interest of patentees come into the ascendency. As we stated in *B. B. Chemical Co.* v. *Ellis*, 314 U. S. 495,

498, "The patent monopoly is not enlarged by reason of the fact that it would be more convenient to the patentee to have it so, or because he cannot avail himself of its benefits within the limits of the grant." From *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* 243 U. S. 502, which overruled *Henry* v. *A. B. Dick Co.,* 224 U. S. 1, to *International Salt Co.* v. *United States,* 332 U. S. 392, decided only the other day, the Court has quite consistently refused to allow the patentee's "right to exclude" to be expanded into a right to license the patent on such conditions as the patentee might choose. For the power to attach conditions would enable the patentee to enlarge his monopoly by contract and evade the requirements of the general law applicable to all property. The philosophy of those decisions was summed up in *Mercoid Corp.* v. *Mid-Continent Investment Co.,* 320 U. S. 661, 666, where we said:

> "The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. . . . The patent is a privilege. But it is a privilege which is conditioned by a public purpose. It results from invention and is limited to the invention which it defines. When the patentee ties something else to his invention, he acts only by virtue of his right as the owner of property to make contracts concerning it and not otherwise. He then is subject to all the limitations upon that right which the general law imposes upon such contracts."

The Court, however, allowed an exception in this long line of cases. In *United States* v. *General Electric Co., supra,* decided in 1926, it followed *Bement* v. *National*

*Harrow Co.,* 186 U. S. 70, decided in 1902, and sustained a price-fixing provision of a license to make and vend the patented invention. By that decision price-fixing combinations which are outlawed by the Sherman Act (*United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150) were held to be lawful when the property involved was a patent. By what authority was this done?

The patent statutes do not sanction price-fixing combinations. They are indeed wholly silent about combinations. So far as relevant here, all they grant, as already noted, is the "exclusive right to make, use, and vend the invention or discovery." Rev. Stat. § 4884, 35 U. S. C. § 40. There is no grant of power to combine with others to fix the price of patented products. Since the patent statutes are silent on the subject, it would seem that the validity of price-fixing combinations in this field would be governed by general law. And since the Sherman Act outlaws price-fixing combinations it would seem logical and in keeping with the public policy expressed in that legislation to apply its prohibitions to patents as well as to other property. The Court made an exception in the case of these price-fixing combinations in order to make the patent monopoly a more valuable one to the patentee. It was concerned with giving him as high a reward as possible. It reasoned that if the patentee could not control the price at which his licensees sold the patented article, they might undersell him; that a price-fixing combination would give him protection against that contingency and therefore was a reasonable device to secure him a pecuniary reward for his invention. Thus the *General Electric* case inverted Cl. 8 of Art. I, § 8 of the Constitution and made the inventor's reward the prime rather than an incidental object of the patent system.

In that manner the Court saddled the economy with a vicious monopoly. In the first place, this form of

price fixing underwrites the high-cost producer. By protecting him against competition from low-cost producers, it strengthens and enlarges his monopoly. It is said in reply that he, the patentee, has that monopoly anyway—that his exclusive right to make, use, and vend would give him the right to exclude others and manufacture the invention and market it at any price he chose. That is true. But what he gets by the price-fixing agreement with his competitors is much more than that. He then gets not a benefit inherent in the right of exclusion but a benefit which flows from suppression of competition by combination with his competitors. Then he gets the benefits of the production and marketing facilities of competitors without the risks of price competition. Cf. *United States* v. *Masonite Corp., supra*. In short, he and his associates get the benefits of a conspiracy or combination in restraint of competition. That is more than an "exclusive right" to an invention; it's an "exclusive right" to form a combination with competitors to fix the prices of the products of invention. The patentee creates by that method a powerful inducement for the abandonment of competition, for the cessation of litigation concerning the validity of patents, for the acceptance of patents no matter how dubious, for the abandonment of research in the development of competing patents. Those who can get stabilized markets, assured margins, and freedom from price cutting will find a price-fixing license an attractive alternative to the more arduous methods of maintaining their competitive positions. Competition tends to become impaired not by reason of the public's preference for the patented article but because of the preference of competitors for price fixing and for the increased profits which that method of doing business promises.

Price fixing in any form is perhaps the most powerful of all inducements for abandonment of competition. It offers security and stability; it eliminates much of the uncertainty of competitive practices; it promises high profits. It is therefore one of the most effective devices to regiment whole industries and exact a monopoly price from the public. The benefits of competition disappear. The prices charged by the regimented industry are determined not by representatives of the public, as in the case of electric, water, and gas rates, but by private parties who incline to charge all the traffic will bear. And the type of combination in this case has the power to inflict precisely the type of public injury which the Sherman Act condemns. This price-fixing scheme does far more than secure to inventors "the exclusive right" to their discoveries within the meaning of Cl. 8 of Art. I, § 8 of the Constitution. It gives them a leverage on the market which only a combination, not a patent by itself, can create. Yet it is "every" combination in restraint of trade which § 1 of the Sherman Act condemns, price-fixing combinations dealing with patents not excluded.

Congress has much to say as to the pattern of our economic organization. But I am not clear that Congress could expand "the exclusive right" specified in the Constitution into a right of inventors to utilize through a price-fixing combination the production and marketing facilities of competitors to protect their own high costs of production and eliminate or suppress competition. It is not apparent that any such restriction or condition promotes the progress of science and the useful arts. But however that may be, the Constitution places the rewards to inventors in a secondary role. It makes the public interest the primary concern in the patent system. To allow these price-fixing schemes is to reverse the order and place the rewards to inventors first and the public

second. This is not the only way a patentee can receive a pecuniary reward for his invention. He can charge a royalty which has no relation to price fixing. Or he can manufacture and sell at such price as he may choose. Certainly if we read the patent statutes so as to harmonize them as closely as possible with the policy of anti-trust laws, we will strike down a combination which is not necessary to effectuate the purpose of the patent statutes. If we did that in this case we would overrule the *General Electric Co.* case.

This Court, not Congress, was the author of the doctrine followed in that case. The rule it sanctions is another of the private perquisites which the Court has written into the patent laws. See *Special Equipment Co.* v. *Coe,* 324 U. S. 370, 383. Since we created it, we should take the initiative in eliminating it. It is hard for me to square it with the standards which the Constitution has set for our patent system It plainly does violence to the competitive standards which Congress has written into the Sherman Act.

MR. JUSTICE BURTON, with whom THE CHIEF JUSTICE and MR. JUSTICE FRANKFURTER concur, dissenting.

This dissent is impelled by regard for the soundness, authority and applicability to this case of the unanimous decisions of this Court in *Bement* v. *National Harrow Co.,* 186 U. S. 70, and *United States* v. *General Electric Co.,* 272 U. S. 476.

The complaint charges violation of § 1 of the Sherman Antitrust Act [1] by the defendant patent owners and cross-licensors, Line Material Company and Southern States Equipment Corporation (here called respectively Line

---

[1] 26 Stat. 209, as amended, 50 Stat. 693, 15 U. S. C. § 1.

and Southern), and also by the ten defendants who hold licenses under the two complementary patents, owned respectively by Line and Southern. These patents are for dropout fuse cutouts. Southern's patent is the dominant patent but the product made under it alone has not been commercially successful. Line's patent is for an improvement of that product which has made it commercially successful. Each of the twelve defendants has received and exercised authority under both patents to make and sell this improved product, but the Government charges them with having engaged in an unlawful combination and conspiracy in restraint of trade to fix, maintain and control the prices at which they have sold, in interstate commerce, their respective products under these patents. It is not disputed that the sales were made in interstate commerce. The trial court's findings of fact demonstrate, however, that there have been no agreements between any of the defendants with respect to the prices of these products other than the price-limiting provisions contained in their respective licenses.[2] The findings of fact show also that, unless the Government

---

[2]

"32. . . . Apart from the written license agreements here in evidence, there was no agreement, express or implied, between the licensor and any licensee, or between any two or more licensees, with respect to the prices of licensed dropout fuse cutouts.

. . . . .

"34. . . . There was no agreement, express or implied, between Line and Southern with respect to prices on cutouts other than the written cross-license agreements.

. . . . .

"36. There was no combination or conspiracy among the defendants, or any of them, to fix, maintain or control prices of dropout fuse cutouts or parts thereof, or to restrain trade or commerce therein." (Findings of fact.)

sustains its contention that those provisions constitute, *per se,* an unlawful restraint of trade, its complaint should be dismissed.[3]

---

[3] In addition to the findings quoted in note 2, *supra,* the trial court found:

"9. The validity of the United States letters patent involved in the licenses of the defendants is not contested by the plaintiff in this action, and therefore is not here in issue.

.       .       .       .       .

"27. None of the license agreements aforesaid restrains trade in any article moving in interstate commerce, and none of them was entered into as a result of any conspiracy to restrain such trade.

"28. . . . The prices listed in Schedule A are Line's own selling prices, determined solely by Line without discussion with or advice from any other defendant.

"29. Under the cross-licenses with Southern and its licenses to others, Line established minimum prices only for structures within the ambit of the claims of its own patents. The classification schedules attached to the license agreements were only such as were reasonably necessary to protect the business of the licensor and implement the license agreement so as to prevent evasion by a licensee of lawful price limitation provisions. Line did not establish minimum selling prices for any device not covered by a claim of its Schultz patent Re. 22,412 or its Kyle patent Re. 19,449.

.       .       .       .       .

"31. There is no charge of monopoly by the defendants. There was no fixing of resale prices on licensed dropout fuse cutouts by the defendants or any of them. . . .

"32. The price limitation provisions contained in the various license agreements here in evidence were insisted upon by the patent owner and were intended and reasonably adapted to protect its own business and secure pecuniary reward for the patentee's monopoly. Each of the licenses granted to the licensee-defendants was taken and granted in good faith, the parties to the licenses believing a license under the patents to be necessary in order that the licensee could continue lawfully to manufacture and sell its dropout fuse cutouts. . . .

.       .       .       .       .

"34. The cross-license agreements between Line and Southern

The question thus presented is: do the price-limiting provisions in some or all of the licenses under Line's or Southern's patents constitute a restraint of trade in violation of § 1 of the Sherman Act? We agree with the court

were limited to the commercially practicable device covered by the subservient Schultz [Line's] patent, and did not create additional power for price control of the licensed cutouts over that which each had before entering into the agreements. . . . Such cross-license agreements were entered into in good faith, not for the purpose of fixing prices in the industry but to permit the manufacture and sale of the cheaper device covered by the subservient patent, to facilitate the negotiation of licenses, and to provide royalty income. . . .

"35. The license agreements here in evidence did not restrain trade but promoted it by making available several sources where the patented devices could be obtained, thus increasing competition in such devices, particularly with respect to design, quality and service. Competition among the defendants for business in these devices continued to be vigorous after the making of the license agreements."

That the patents did not represent an industry-wide control appears from the following finding:

"5. The defendants are all manufacturers of electrical devices of various kinds. The dropout fuse cutouts manufactured by the defendants under the patent licenses have been and are in open competition with many other devices which perform the same functions and are not manufactured under the patent licenses, such as open single hinge dropout fuse cutouts; open non-dropout fuse cutouts; non-dropout fuse cutouts enclosed in materials other than cast wet-process porcelain, such as Prestite; automatic circuit breaker cutouts; and others listed in Defendants' Exhibit L–23. The average aggregate annual sales of licensed dropout fuse cutouts manufactured by all the defendants from 1940 to 1944 was $1,918,247.78 and constituted only 40.77% of the average aggregate annual sales of all licensed and competitive cutouts manufactured and sold by all the defendants, and were distributed among the defendants as follows: General Electric, 29.2%; Line [,] 25.4% [;] Kearney, 18.9%; Southern, 7.9%; Westinghouse, 5.3%; Schweitzer and Conrad, 5.1%; Railway, 3.8%; Matthews, 2%; Porcelain, 1.5%; Royal, 0.5%; Pacific, 0.2%; and Johnson, 0.2%."

below that they do not.[4]   The price-limiting provisions in this case are comparable to those which, in the *Bement* and *General Electric* cases, *supra,* were held not to violate the Sherman Act.   This Court sustained the agreement in the *Bement* case because the Sherman Act—

> "clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor.   Such a construction of the act we have no doubt was never contemplated by its framers."   (At p. 92.)

The license in that case was issued under several patents and, as here, it limited the prices at which the licensee was authorized to sell articles produced by the licensee under that license.   In the *General Electric* case, this Court, in speaking of the patent holder's right to limit the selling prices of his licensee's products, said:

> "We think he [the patent holder] may do so, provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly.   One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold."   (At p. 490.)

In the present case, there are two types of license agreements.   The price-limiting provisions are the same in each.   The first type is that of the cross-licensing agreement between Line and Southern.   In it Line granted

---

[4]

"2. The cross-licenses and the license agreements entered into between the various defendants, as set forth in the preceding Findings of Fact, are lawful agreements." (Conclusions of law.)

to Southern a nonexclusive, royalty-free license to make and sell the products here in question. Line also prescribed that Southern's prices, terms and conditions of sale should be "not more favorable to the customer than those established from time to time and followed by the Line Company in making its sales." The difference between this license agreement and Line's agreements with each of the other defendants is that Southern, in return for this license, instead of paying cash royalties to Line, issued to Line a limited cross-license under Southern's complementary patent on a dropout fuse cutout. Southern also granted to Line an exclusive right to issue sublicenses under that patent. Southern inserted no price limitation in its cross-license to Line and Line made no commitment to insert price limitations in any sublicense which it might issue under Southern's patent. As far as price limitations were concerned, they all were contained in the royalty-free, nonexclusive license from Line to Southern and were applicable only to products made and sold by the latter under Line's patent. Assuming that the limitations thus placed by Line on the price of Southern's products, made and sold by it under Line's complementary patent, were reasonable limitations, especially in relation to Line's own operations under the same patent, they represented a lawful protection of Line's patent interests. They evidenced a normal exercise by a manufacturing patentee "of the exclusive right of a patentee . . . to acquire profit by the price at which the article is sold."[5] In some ways, they were even more natural and reasonable provisions for insertion by Line than would have been a bare provision for royalties. Line evidently needed these price limitations to enable it to continue to make and sell the product which its own improvement had converted from a commercial failure

---

[5] *United States* v. *General Electric Co., supra,* at p. 490.

into a commercial success. It will be demonstrated later that Line's receipt of a royalty-free, unconditional cross-license under Southern's complementary patent, as consideration for Line's license to Southern, did not, *per se,* convert this otherwise lawfully limited license into an invalid license violating the Sherman Act.

The other type of license that was used by Line was that of a direct license issued separately to each of the ten other licensee-defendants. These licenses closely resembled each other. Each was a nonexclusive license calling for the payment of a modest royalty to Line on each product made and sold by the licensee under Line's patent. Each included price limitations comparable to those in Line's license to Southern. These price-limiting licenses from Line are, as such, entirely comparable to those in the *Bement* and *General Electric* cases. Each license, however, also included a sublicense issued by Line under Southern's complementary patent. The royalties on the products made and sold under the two complementary patents were to be divided equally between Line and Southern. It will be demonstrated later that this sublicense under Southern's complementary patent and the agreement by Line to divide with Southern the royalties received upon products made and sold under the two patents did not, *per se,* convert these otherwise lawfully limited licenses into invalid licenses violating the Sherman Act.

Line also granted to certain licensee-defendants desiring it, a license under Line's so-called "Kyle patent" for enclosed fuse boxes. Some of these licenses carried price limitations on products made and sold by the licensee under the Kyle patent. These licenses are entirely comparable to those in the *Bement* and *General Electric* cases. They are well within the scope of those precedents and carry no suggested basis for a distinction claimed to con-

vert them into invalid licenses violating the Sherman Act.

The Government now asks this Court to overrule the *Bement* and *General Electric* cases. The opinion by MR. JUSTICE REED rejects that request but seeks to justify a reversal of the judgment below by distinguishing this case from those precedents. This dissent undertakes not only to emphasize the soundness of the *Bement* and *General Electric* decisions, but to demonstrate that the basic principles which sustain those decisions apply to this case with at least equal force. This initial discussion will omit the consideration of the cross-license from Southern to Line, the grant from Southern to Line of the exclusive right to issue sublicenses under the Southern patent and the agreement for the division of royalties between Southern and Line. The *Bement* and *General Electric* decisions are authority for upholding the remaining portions of such agreements in the light of the previously mentioned findings of fact which show that the agreements "arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor"[6] and that "the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly."[7] This dissent accordingly re-examines the foundation for those decisions and emphasizes the development, nature and effect of the patent rights which are decisive of the main issue both in those cases and in this.

### PATENT RIGHTS.

An understanding of the historical development and of the nature of patent rights in the United States is

[6] *Bement* case, *supra*, at p. 92.

[7] *General Electric* case, *supra*, at p. 490.

essential to a discussion of the relation between them and the restraints of trade prohibited by the Sherman Act. American patent rights find their origin in Great Britain. That nation appears to have been the first to issue "patents" to secure to inventors for limited times exclusive rights to their respective discoveries. These "patents" were called *"literae patentes,"* i. e., "open letters," because they were not sealed up but were exposed to view with the Great Seal pendant at the bottom. They were addressed by the sovereign to all subjects of the realm. Such instruments were, and to a degree still are, the common form used for making grants of dignities, such as peerages, appointments to certain offices and grants of privilege of various kinds. Their form, therefore, was similar to that of the "patents" used to grant exclusive rights or "monopolies" to trade guilds, corporations and, in some cases, individuals, permitting them to exclude competitors from the conduct of certain lines of profitable business.[8]

The contrast between these two kinds of exclusive rights in their relation to the public was reflected later in acts of the British Parliament and in the Constitution and statutes of the United States. A patent to an inventor took nothing from the public which the public or the inventor's competitors already had. By hypothesis, it dealt with a new asset available to civilization only through its inventor. The royal patent served to encourage the inventor to disclose his invention. By grant-

---

[8] An early patent for the establishment of a new industry was granted to a Flemish weaver in 1331. There are records of a merchant, in 1347, having a monopoly for exporting Cornish tea and of an individual, in 1376, having a monopoly to sell sweet wines in the City of London. The first patent for a new invention that has been found in the records dates from 1561 and covers the manufacture of saltpetre. Meinhardt, Inventions, Patents and Monopoly, pp. 30, 35 (London, 1946).

ing to the inventor the right to exclude all others from making, using or selling the invention for a limited time, it was felt that the public was well served by the invention's disclosure, its early availability under the patent and its later general availability to everyone. This procedure was popular. On the other hand, royal patents securing exclusive rights to private parties to conduct profitable enterprises to the exclusion of existing or available competitors were issued to show royal favor or to secure funds at the expense of the public. Such patents became highly unpopular. The courts, at an early date, held them invalid.[9]

As early as 1602, Francis Bacon, in the House of Commons, supported the principle that a monopoly should be granted only for a "new manufacture." In 1623, there was enacted the Statute of Monopolies (21 Jac. I, c. 3, § I; 1 Walker on Patents, pp. 18–21 (Deller's ed. 1937)) which declared void all monopolies and letters patent "of or for the sole Buying, Selling, Making, Working or Using of any Thing within this Realm, . . . ." However, § VI of this Act made an express exception in favor of patents for inventions.[10] That Section has become the

___

[9] In 1602, in *The Case of Monopolies, Darcy* v. *Allein,* 6 Co. Rep., [Q. B.] 159, Part XI–84b; 1 Am. & Eng. Pat. Cas. (Abbott) 1; Webs. Pat. Cas. 1; a royal grant of exclusive right to manufacture playing cards within the realm was held void as violating the common law and several Acts of Parliament. And see 1 Walker on Patents, pp. 12–16 (Deller's ed. 1937).

[10]

"VI. Provided also, and be it declared and enacted, That any Declaration before-mentioned shall not extend to any Letters Patents and Grants of Privilege for the Term of fourteen Years or under, hereafter to be made, of the sole Working or Making of any manner of new Manufactures within this Realm, to the true and first Inventor and Inventors of such Manufactures, which others at the Time of Making such Letters Patents and Grants shall not use, so as also they be not contrary to the Law,

foundation of the patent law securing exclusive rights to inventors not only in Great Britain but throughout the world.

The result, historically and in principle, has not been a conflict between two legislative mandates. It has been rather a long standing approval, both by the British Parliament and the Congress of the United States, of the unique value of the exercise, for limited periods, of exclusive rights by inventors to their respective inventions, paralleled by an equally sustained and emphatic disapproval of certain other restraints of trade not representative of exclusive rights of inventors to their inventions.

The long and unfaltering development of our patent law often has been touched upon in our decisions. However, in the face of the direct attack now made upon some of its underlying principles, the infinite importance of our inventions justifies a brief review here of the development

---

nor mischievous to the State, by raising Prices of Commodities at home, or Hurt of Trade, or generally inconvenient: The said fourteen Years to be accounted from the Date of the first Letters Patents, or Grant of such Privilege hereafter to be made, but that the same shall be of such Force as they should be, if this Act had never been made, and of none other." 21 Jac. I, c. 3 (1623).

"The Statute of Monopolies created no new right either in the Crown or the people; it was simply declaratory of the common law and enacted into statute law, which bound the Sovereign, the doctrines that the courts had repeatedly affirmed, and reiterated those principles of the Magna Charta (9 Henry III, Ch. XXXVII, A. D. 1225) which declared that the liberties of his subjects shall not be infringed or broken by royal usurpation, and it limited the royal prerogative to certain definite terms and conditions under which it might be lawfully exercised. It is to be noted that there was a reservation of Letters Patent and grants of the privilege of the sole working or making of any new manufactures within the realm to the true and first inventor; conferring upon him an exclusive privilege for the term of fourteen years." 1 Walker on Patents, *supra*, at p. 22.

and nature of the patent rights attacked. The decision in this case must turn upon this Court's understanding of the relation between the licenses before it, the patent rights to which they relate and the Sherman Act. As interpreter of the Congressional Acts that have expressed the patent policy of this nation since its beginning, this Court is entrusted with the protection of that policy against intrusions upon it. The crucial importance of the development of inventions and discoveries is not limited to this nation. As the population of the world has increased, its geographical frontiers have shrunk. However, the frontiers of science have expanded until civilization now depends largely upon discoveries on those frontiers to meet the infinite needs of the future. The United States, thus far, has taken a leading part in making those discoveries and in putting them to use.

The Constitution of the United States provides that "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, *by securing for limited Times to* Authors and *Inventors the exclusive Right to their respective* Writings and *Discoveries; . . . .*" (Italics supplied.) Art. I, § 8.

The statutes primarily implementing this provision state:

> "Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, . . . not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than one year prior to his application, and not in public use or on sale in this country for more than one year prior to his application, unless the same is proved to have been abandoned, may, upon payment of the

fees required by law, and other due proceeding had, obtain a patent therefor." R. S. § 4886, as amended, 46 Stat. 376, 53 Stat. 1212, 35 U. S. C. § 31.

"Every patent shall contain a short title or description of the invention or discovery, correctly indicating its nature and design, and a *grant to the patentee, his heirs or assigns, for the term of seventeen years, of the exclusive right to make, use, and vend the invention or discovery* . . . throughout the United States and the Territories thereof, referring to the specification for the particulars thereof. . . ." (Italics supplied.) R. S. § 4884, as amended, 46 Stat. 376, 35 U. S. C. § 40.[11]

"*Every* application for patent or *patent or any interest therein shall be assignable* in law by an in-

---

[11] The first Act to implement the constitutional provision was approved April 10, 1790. It provided:

"Section 1. . . . , That upon the petition of any person or persons to the Secretary of State, the Secretary for the department of war, and the Attorney General of the United States, setting forth, that he, she, or they, hath or have invented or discovered any useful art, manufacture, engine, machine, or device, or any improvement therein not before known or used, and praying that a patent may be granted therefor, it shall and may be lawful to and for the said Secretary of State, the Secretary for the department of war, and the Attorney General, or any two of them, if they shall deem the invention or discovery sufficiently useful and important, to cause letters patent to be made out in the name of the United States, to bear teste by the President of the United States, reciting the allegations and suggestions of the said petition, and describing the said invention or discovery, clearly, truly and fully, and thereupon *granting to such petitioner or petitioners, his, her or their heirs, administrators or assigns for any term not exceeding fourteen years, the sole and exclusive right and liberty of making, constructing, using and vending to others to be used, the said invention or discovery; . . . .*" (Italics supplied.) 1 Stat. 109–110.

strument in writing, and the applicant or patentee or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent or patent to the whole or any specified part of the United States. . . ." (Italics supplied.) R. S. § 4898, as amended, 55 Stat. 634, 35 U. S. C. (Supp. V, 1946) § 47.

Conway P. Coe, Commissioner of Patents of the United States from 1933 to 1945, discussed the historical significance of the early establishment of the American patent system in his testimony before the Temporary National Economic Committee in 1939. He said:

"The American patent system was established at a time when mechanical inventions had already begun to affect not only the industrial conditions, but also the economic, social, and political status of Europe and the new Nation just erected on this continent. The significance of the inventions put to work in England and the States of the Confederation was realized by the American statesmen of that era. It is agreed that their recognition of the value of these new economic factors prompted them to write into the Constitution the provision of article I, section 8, empowering Congress 'to promote the progress of science and useful arts by securing for limited times to authors and inventors the *exclusive* right to their respective writings and discoveries.' This provision, by the way, is impressive not only because it is included in the Constitution as one of the major grants of power to Congress, but equally because it bestows on patentees a complete monopoly, and therefore raises a question as to the constitutionality of an attempt to compel the owner of a patent to share with others the title, use, and avail of his property. I do not presume to determine the point; but

I must contemplate it as an issue to be met here or hereafter.

"The authors of our patent system, judging by the language of article I, section 8, held the *exclusiveness* of the rights vested in a patentee as a powerful aid to progress in arts and sciences."[12]   Hearings before the Temporary National Economic Committee, 76th Cong., 1st Sess. 839–840 (1939).

---

[12] The Commissioner referred to the special interest of President Jefferson in this subject:

"No American among his contemporaries or his successors has achieved a greater reputation as an opponent of monopoly than Thomas Jefferson.   Yet he not merely sanctioned, he eloquently advocated the form of monopoly represented in patents.   I cite his commentary on an early act of Congress, presumably that of 1790, in the administration of which he collaborated with Henry Knox, Secretary of War, and Edmund Randolph, Attorney General.

'An act of Congress authorizing the issue of patents for new discoveries has given a spring to invention beyond my conception.   Being an instrument of granting the patents, I am acquainted with their discoveries.

.         .         .         .         .

'In the arts, and especially in the mechanical arts, many ingenious improvements are made in consequence of the patent-right giving *exclusive* use of them for 14 years.

'Certainly an inventor ought to be allowed a right to the benefit of his invention for some certain time.   Nobody wishes more than I do that ingenuity should receive liberal encouragement.' "
Hearings before the Temporary National Economic Committee, *supra*, at p. 840.

Some conception of the degree to which the present patent system has been resorted to is found in Commissioner Coe's testimony that, up to 1939, over 2,000,000 patents had been issued, apart from design patents and reissues.   The figure is now approximately 2,500,000 of which all but about 100,000 have been issued since 1870.   He showed also that only about 60% of the applications filed are finally granted. (*Id*. at p. 844, and Exhibits 179 and 180.)   See also, Official Gazette, U. S. Pat. Off., Vol. 605, p. 714 (Dec. 30, 1947).
After the final report of the Temporary National Economic Com-

He analyzed the "patent rights" granted to the inventor and stated his reasons for concluding that the "monopoly"

mittee, the President issued Executive Order No. 8977, December 12, 1941, 1 C. F. R. Cum. Supp. 1040, establishing the National Patent Planning Commission to conduct a comprehensive survey and study of the American patent system and, among other things, to—

"consider whether the system now provides the maximum service in stimulating the inventive genius of our people in evolving inventions and in furthering their prompt utilization for the public good; . . . whether there are obstructions in our existing system of patent laws, and if so, how they can be eliminated; . . . and what methods and plans might be developed to promote inventions and discoveries which will increase commerce, provide employment, and fully utilize expanded defense industrial facilities during normal times."

The President appointed Charles F. Kettering, Chairman, Chester C. Davis, Francis P. Gaines, Edward F. McGrady and Owen D. Young as members of the Committee. The Report of the Committee, transmitted by the President to Congress June 18, 1943 (H. R. Doc. No. 239, 78th Cong., 1st Sess. 1), contained the following:

"The American patent system established by the Constitution giving Congress the 'power to promote the progress of science and useful arts,' is over 150 years old. The system has accomplished all that the framers of the Constitution intended. It is the only provision of the Government for the promotion of invention and discovery and is the basis upon which our entire industrial civilization rests.

"The American people and their Government should recognize the fundamental rightness and fairness of protecting the creations of its inventors by the patent grant. The basic principles of the present system should be preserved. The system has contributed to the growth and greatness of our Nation; it has—

(1) Encouraged and rewarded inventiveness and creativeness, producing new products and processes which have placed the United States far ahead of other countries in the field of scientific and technological endeavor;

(2) Stimulated American inventors to originate a major portion of the important industrial and basic inventions of the past 150 years;

(3) Facilitated the rapid development and general appli-

vested in a patentee is not in conflict with our antitrust laws as follows:

> "It occurs to me that a great deal of misapprehension results from the failure to distinguish between the monopoly or privilege vested in a patentee and the sort of monopoly that British sovereigns once conferred. It is only when we appreciate this distinction that we can understand how Jefferson could consistently advocate the monopoly of patents for inventions while condemning the traditional form of monopoly.

> "Americans generally detest monopoly in the true sense of the term because it makes possible the ruthless exercise of power. Indeed, the American Revolution was precipitated by popular resentment of the monopoly on tea held by the East India Co. It would, therefore, have been exceedingly strange if,

---

cation of new discoveries in the United States to an extent exceeding that of any other country;

(4) Contributed to the achievement of the highest standard of living that any nation has ever enjoyed;

(5) Stimulated creation and development of products and processes necessary to arm the Nation and to wage successful war;

(6) Contributed to the improvement of the public health and the public safety; and

(7) Operated to protect the individual and small business concerns during the formative period of a new enterprise.

The strongest industrial nations have the most effective patent systems and after a careful study, *the Commission has reached the conclusion that the American system is the best in the world."* (Italics supplied.)

In its summary of findings and recommendations it added:

"The patent system is the foundation of American enterprise and has demonstrated its value over a period coextensive with the life of our Government. The principle of recognizing a property right in intellectual creation is sound and should be continued as contemplated in the Constitution." (*Id.* at p. 9.)

only a few years later, the delegates sent to the Constitutional Convention by Massachusetts and the other Colonies had been willing to sanction an equivalent form of monopoly under the new government they were creating. In the sixteenth and seventeenth centuries a king or queen of England could reward a favorite by granting him a monopoly on salt or some other necessary of life. This beneficiary of royal favor was not, of course, the discoverer of salt. That came ready-made from the hands of the Creator eons before the advent of man. What the darling of his or her majesty received was the power to compel others to use salt solely of his supplying and only on terms of his dictation.

"But a patent is no such monopoly. It is a reward for the invention or discovery of something new, something before unknown, something added to the sum total of human knowledge, utility, well-being; something which the inventor or discoverer, despising the lure of money or fame, might have withheld from his fellow men. By the monopoly that goes with a patent, then, the Government recompenses and, for a limited time, protects the inventor or discoverer who gives to the world the use and benefit of his invention or discovery. This is a kind and a degree of mutuality that negatives monopoly in the old or the current concept. Monopoly in the latter sense of the term gave to an individual or a group complete dominion of something already existent. A patent awards monopoly to the producer of something original, something superadded to the common store. So it is that two things bearing the same name need not be of the same nature.

"It has been contended that there sometimes occurs a clash between the antitrust laws and the patent

statutes. I might suggest that since the first anti-trust legislation in 1890, the patent laws and the anti-trust laws have coexisted without any irreconcilable conflicts between them. They have each of them at least one common objective, namely, the retention by the public of a right once acquired by it. As a matter of fact, patents accomplish more than the retention of the acquired rights. Their influence is creative; they operate to multiply and expand acquisitions by the public." (*Id.* at pp. 840–841.)

A comparable analysis of the nature of the grant to inventors of the exclusive right to their respective inventions or discoveries for a limited time has been made by this Court.

"Though often so characterized, a patent is not, accurately speaking, a monopoly, for it is not created by the executive authority at the expense and to the prejudice of all the community except the grantee of the patent. *Seymour* v. *Osborne,* 11 Wall. 516, 533. The term monopoly connotes the giving of an exclusive privilege for buying, selling, working or using a thing which the public freely enjoyed prior to the grant. Thus a monopoly takes something from the people. An inventor deprives the public of nothing which it enjoyed before his discovery, but gives something of value to the community by adding to the sum of human knowledge. *United States* v. *Bell Telephone Co.,* 167 U. S. 224, 239; *Paper Bag Patent Case,* 210 U. S. 405, 424; *Brooks* v. *Jenkins,* 3 Mc-Lean 432, 437; *Parker* v. *Haworth,* 4 McLean 370, 372; *Allen* v. *Hunter,* 6 McLean 303, 305–306; *Attorney General* v. *Rumford Chemical Works,* 2 Bann. & Ard. 298, 302. He may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the com-

munity, the patent is granted. An exclusive enjoyment is guaranteed him for seventeen years, but upon the expiration of that period, the knowledge of the invention enures to the people, who are thus enabled without restriction to practice it and profit by its use. *Kendall* v. *Winsor*, 21 How. 322, 327; *United States* v. *Bell Telephone Co., supra*, p. 239. To this end the law requires such disclosure to be made in the application for patent that others skilled in the art may understand the invention and how to put it to use." *United States* v. *Dubilier Condenser Corp.*, 289 U. S. 178, 186–187.[13]

[13] In *Grant* v. *Raymond*, 6 Pet. 218, 241–242, 243, Chief Justice Marshall said:

"The law farther declares that the patent 'shall be good and available to the grantee or grantees by force of this act, to all and every intent and purpose herein contained.' The emendatory act of 1793 contains the same language, and it cannot be doubted that the settled purpose of the United States has ever been, and continues to be, to confer on the authors of useful inventions an exclusive right in their inventions for the time mentioned in their patent. It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made; and to execute the contract fairly on the part of the United States, where the full benefit has been actually received: if this can be done without transcending the intention of the statute, or countenancing acts which are fraudulent or may prove mischievous. The public yields nothing which it has not agreed to yield; it receives all which it has contracted to receive. The full benefit of the discovery, after its enjoyment by the discoverer for fourteen years, is preserved; and for his exclusive enjoyment of it during that time the public faith is pledged. . . .

.      .      .      .      .

"The great object and intention of the act is to secure to the public the advantages to be derived from the discoveries of

This constitutional and legislative policy toward inventions is specific in contrast with the generality of the language in the Sherman Act of 1890. The constitutional and long standing statutory approval of the exclusive rights of an inventor to make, use and sell products of his invention for a limited time was an ample guaranty that the Sherman Act did not directly or impliedly repeal such approval. The prohibition of unreasonable restraints of trade and the approval of exclusive rights of inventors to their inventions for limited periods of time continued to exist together. This was nothing new. As long as the inventors kept within their statutory exclusive rights, they were not engaging in unreasonable restraints of trade violating the Sherman Act.

There was nothing to indicate an intent that the general language of the Sherman Act was to change the nation's traditional and specifically stated policy towards inventions. That policy had been widely regarded as having made a major contribution to the nation's exceptional economic progress. The Sherman Act unquestionably applied to any abuse of a patentee's exclusive rights which exceeded the limit of those rights and which amounted to an unreasonable restraint of interstate trade. However, there was nothing to indicate that the Sherman Act restricted the traditional patent rights. *Bement* v. *National Harrow Co., supra,* at p. 92.

### LIMITED LICENSE AGREEMENTS.

The primary issue in this case, therefore, is to determine whether or not Line by the issuance of its restricted licenses has thereby sought to exercise any right that is in excess of the exclusive right secured to Line by the

---

individuals, and the means it employs are the compensation made to those individuals for the time and labour devoted to these discoveries, by the exclusive right to make, use and sell, the things discovered for a limited time."

patent laws of the United States. If it has done so, then such licenses, like other agreements, must be scrutinized to determine whether or not they create an unreasonable restraint of trade in violation of the Sherman Act.

The first consideration is the relation of the Sherman Act to provisions in a license agreement which place limitations—as in the *Bement* and *General Electric* cases—upon the prices which may be charged by the licensee for products made and sold by it under the protection of its license. The issue corresponds to that raised by the Westinghouse license in the *General Electric* case.[14] The Sherman Act's invalidation of agreements in restraint of trade applies only to those in unreasonable restraint of trade and the definition of such unreasonableness depends largely upon the common law meaning of restraint of trade.[15] This permits such invalidation where, for example, a license is a mere subterfuge for price fixing which otherwise would amount to unreasonable restraint of trade in violation of the Sherman Act. See *United States* v. *U. S. Gypsum Co., post,* p. 364, decided concurrently with this case.[16]

---

[14] There is no issue here corresponding to the other issue examined and upheld in the *General Electric* case, namely, that involving the validity of the patentee's agency system of sales of its patented article. Another system for making sales of a patented article has been held invalid where the "agencies" were found not to be bona fide agencies. *United States* v. *Masonite Corp.,* 316 U. S. 265. That case, in turn, did not reach the issue raised by the Westinghouse license in the *General Electric* case. The Court there said (p. 277) : "we need not reach the problems presented by *Bement* v. *National Harrow Co.,* 186 U. S. 70, and that part of the *General Electric* case which dealt with the license to Westinghouse Company."

[15] *United States* v. *American Tobacco Co.,* 221 U. S. 106, 179–180. See also, *Standard Oil Co.* v. *United States,* 221 U. S. 1.

[16] The instant case also is to be distinguished sharply from those in which the parties to a license have sought to fix prices for the resale by the licensee of patented products previously sold to the licensee by

The Sherman Act's prohibition of unreasonable restraints of trade, accordingly, would not invalidate an unconditional, nonexclusive license agreement which served only to release the licensee from the right of the patent holder to exclude him from making, using or selling a patented article. The original, exclusive right of the patent holder, being secured to him through the terms of his patent, was not in violation of the Sherman Act. Accordingly, his release or waiver of a part of that exclusive right by issuance of an unconditional, nonexclusive license, *per se,* decreased rather than increased the statutory restraint of trade to which he was entitled.

The next question is whether the insertion in such a license of some limitation upon the licensee's right to sell the articles made by the licensee under the patent, *per se,* converts this otherwise lawful agreement into an unreasonable restraint of trade violative of the Sherman Act. The answer is no. Just as an unlimited license is a partial, but lawful, relaxation of the lawful restraint of trade imposed by the patent, so a limited license is but a correspondingly less relaxation of that same restraint.

The fact that the limitation in the license is a limitation on the price which may be charged by the licensee in making sales of the article made by the licensee under the protection of the patent does not change the answer, provided the price prescribed is "normally and reasonably adapted to secure pecuniary reward for the

the patentee or others. *United States* v. *Univis Lens Co.,* 316 U. S. 241, 252; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 452, 456–457; *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* 243 U. S. 502, 516; *Straus* v. *Victor Talking Machine Co.,* 243 U. S. 490, 500–501; *Bauer & Cie* v. *O'Donnell,* 229 U. S. 1, 16–17. See also, *Standard Oil Co.* v. *United States,* 283 U. S. 163, 169; *United Shoe Mach. Co.* v. *United States,* 258 U. S. 451, 463–464; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 48–49; *Adams* v. *Burke,* 17 Wall. 453, 455–456.

patentee's monopoly." [17]   Here again, the restraint of
trade imposed by the patent itself is lawful.   Therefore,
as long as the license agreement has only the effect of
reducing the lawful restraint imposed by the patent, such
agreement merely converts the original lawful restraint
into a lesser restraint, equally lawful.

Such agreements should be carefully scrutinized to
make sure that they do not introduce new restrictions
which, as judicially construed, unreasonably restrain trade
and thus violate the Sherman Act.   In the instant case
the findings eliminate such possibilities and thus reduce
the issue here to one comparable with the issue in the
*Bement* and *General Electric* cases.

This brings us to a further discussion of the nature
of the license in the present case and of the precise limi-
tations contained in it.   This requires, first of all, a con-
sideration of the nature of the exclusive right to make,
use and sell the patented product.   The precise nature
of such a "patent right" has been described as follows by
Chief Justice Taft in a unanimous opinion of this Court:

> "It is the fact that the patentee has invented or dis-
> covered something useful and thus has the common
> law right to make, use and vend it himself which
> induces the Government to clothe him with power
> to exclude everyone else from making, using or vend-
> ing it.   In other words, the patent confers on such
> common law right the incident of exclusive enjoy-
> ment and it is the common law right with this in-
> cident which a patentee or an assignee must have
> [in order to bring a suit for infringement].   That is
> the implication of the descriptive words of the grant
> 'the exclusive right to make, use and vend the inven-
> tion.'   The Government is not granting the common
> law right to make, use and vend, but it is grant-
> ing the incident of exclusive ownership of that com-

---

[17] *General Electric* case, *supra*, at p. 490.

mon law right, which can not be enjoyed save with the common law right. A patent confers a monopoly. So this Court has decided in the *Paper Bag Case, supra* [210 U. S. 405], and in many other cases. The idea of monopoly held by one in making, using and vending connotes the right in him to do that thing from which he excludes others." *Crown Co.* v. *Nye Tool Works,* 261 U. S. 24, 36–37.

This analysis is the key to the issue before us. It demonstrates that the common law right to make, use and sell the product of an unpatented invention exists without any right to exclude others from so making, using or selling such product. The additional "exclusive right," or so-called "patent right," which is added to the common law right of the inventor is added by authority of the Constitution and of the federal statutes, so as to promote the progress of science, the useful arts and, no doubt, the general welfare. The patent or any interest therein may be assigned. R. S. § 4898, as amended, 55 Stat. 634, 35 U. S. C. (Supp. V, 1946) § 47.[18] An assignee, exercising

[18] In discussing this patent monopoly and the patent laws of the United States this Court long ago said:

"The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. Rev. Stat. § 4898. . . . Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. Rev. Stat. § 4919; *Gayler* v. *Wilder,* 10 How. 477, 494, 495; *Moore* v. *Marsh,* 7 Wall. 515." *Waterman* v. *Mackenzie,* 138 U. S. 252, 255.

This was quoted with approval in *Crown Co.* v. *Nye Tool Works,* 261 U. S. 24, 37, and was enlarged upon in the *General Electric* case, *supra,* at p. 489.

his right to exclude others during the life of the patent from making, using or selling articles under protection of the patent, does not practice a restraint of trade in violation of the Sherman Act any more than would his assignor if the assignment had not been made.

Any attempted assignment or transfer short of those indicated in the statute "is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement." [19]  The legal position of the holder of a simple, unconditional, nonexclusive license is important.[20]  Before his receipt of his license, he had the common law right to make, use and sell the patented article as well as other articles, *except to the important extent prevented by the patentee's exclusive rights*.  The license changed that position by withdrawing from the licensee, to the extent of the license, the restriction which the patent placed upon him.  Accordingly, to the extent of his license, the restraint placed upon trade by the patent was diminished.  In relation to the Sherman Act his license, instead of creating an added ground for asserting a violation of the Sherman Act, thus, *per se*, relaxed an existing restraint of trade.  The previous restraint imposed by the patent was not a violation of the Sherman Act and, therefore, the mere lessening of that restraint was not a violation of that Act.  The important point is the need to see to it that the lessening of the restraint resulting from the issuance of either an absolute license or a limited license is, in fact, no more than a mere withdrawal of the lawful restraint imposed by the patent and is not either directly or indirectly an imposition of a new restraint not within the ambit of the patent

---

[19] See note 18, *supra*.

[20] " 'As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee,' . . . ." Quoted with approval by Chief Justice Taft in a unanimous opinion of the Court in *De Forest Co.* v. *United States*, 273 U. S. 236, 242.

right. An unconditional, nonexclusive and royalty-free license presents, *per se,* no need for special scrutiny under the Sherman Act. A royalty-yielding license presents the issue suggested by the language in the *General Electric* case. In order not to violate the Sherman Act, the royalty must be "normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly." [21] However, as well explained in that case, a royalty may not, by itself, satisfy the needs of the patent holder. Limitations on the price of sales by the licensee of products made by the licensee under the patent may be the best, or even the only, condition that is thus "normally and reasonably adapted" to the situation.

The following statements illustrate the directness with which this Court repeatedly has decided in favor of the validity of limited licenses when that question has been before it:

". . . the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal." *Bement* v. *National Harrow Co., supra,* at p. 91.

"As was said in *United States* v. *General Electric Co.,* 272 U. S. 476, 489, the patentee may grant a license 'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.' The re-

---

[21] *General Electric* case, *supra,* at p. 490.

striction here imposed [upon the licensee to manu-
facture and to sell the patented article for certain
uses only] is of that character. The practice of
granting licenses for a restricted use is an old one,
see *Rubber Company* v. *Goodyear,* 9 Wall. 788,
799, 800; *Gamewell Fire-Alarm Telegraph Co.* v.
*Brooklyn,* 14 F. 255. So far as appears, its legality
has never been questioned." *General Talking Pic-
tures Corp.* v. *Western Electric Co.,* 305 U. S. 124,
127.

The normality, reasonableness and practical necessity
for inserting a price-limiting condition in certain licenses,
without trespassing upon the prohibited area of unlawful
restraints of trade, is effectively summarized in the *Gen-
eral Electric* case, at p. 490:

"If the patentee goes further, and licenses the selling
of the articles, may he limit the selling by limiting
the method of sale and the price? We think he may
do so, provided the conditions of sale are normally
and reasonably adapted to secure pecuniary reward
for the patentee's monopoly. One of the valuable
elements of the exclusive right of a patentee is to
acquire profit by the price at which the article is sold.
The higher the price, the greater the profit, unless it
is prohibitory. When the patentee licenses another
to make and vend, and retains the right to continue
to make and vend on his own account, the price at
which his licensee will sell will necessarily affect the
price at which he can sell his own patented goods.
It would seem entirely reasonable that he should say
to the licensee, 'Yes, you may make and sell articles
under my patent, but not so as to destroy the profit
that I wish to obtain by making them and selling
them myself.' He does not thereby sell outright to
the licensee the articles the latter may make and

sell, or vest absolute ownership in them. He restricts the property and interest the licensee has in the goods he makes and proposes to sell." [22]

---

[22] Chief Justice Taft, at pp. 490–491, made the following significant references to the *Bement* case:

"This question was considered by this Court in the case of *Bement* v. *National Harrow Company*, 186 U. S. 70. A combination of manufacturers owning a patent to make float spring tool harrows, licensed others to make and sell the products under the patent, on condition that they would not during the continuance of the license sell the products at a less price, or on more favorable terms of payment and delivery to purchasers, than were set forth in a schedule made part of the license. That was held to be a valid use of the patent rights of the owners of the patent. It was objected that this made for a monopoly. The Court, speaking by Mr. Justice Peckham, said (p. 91):

" 'The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal.'

"Speaking of the contract, he said (p. 93):

" 'The provision in regard to the price at which the licensee would sell the article manufactured under the license was also an appropriate and reasonable condition. It tended to keep up the price of the implements manufactured and sold, but that was only recognizing the nature of the property dealt in, and providing for its value so far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article.' "

Judge Westenhaver, whose judgment in the District Court was affirmed by this Court in the *General Electric* case, said:

"If both licensor and licensee are making and selling, it is quite conceivable that the owner of the patent could not safely grant licenses at all on any other terms; otherwise, he would risk having

During the hearings of the Temporary National Economic Committee, testimony was received from the Commissioner of Patents and manufacturers familiar with the commercial development of patented products bearing on the reasonableness and propriety of price limitations in patent licenses comparable to those in the present case. It was to the effect that commercially successful mechanical inventions, such as those in the electrical, communications and automotive industries, usually represent not only the intrinsic merit of the inventions themselves but a substantial investment in research, experimentation and promotion. If, after the disclosure of the invention, others are to be licensed to make the patented article, the costs of production by such licensees will reflect none of the investments above-mentioned. If the patentee is to be reimbursed for his expenditures, he will need, therefore, to secure the benefit of a royalty sufficient to accomplish this or of a restriction on the price at which licensees may sell their products under the patent. This price would have to be one that would enable the patentee to manufacture and sell the article in such quantities and at such prices as would produce a return to him commensurate with his investment in it. He might prescribe both a royalty and a restriction. As long as the royalties and the prices were "normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly" [23] they would perform much the same function.[24]

---

his business destroyed, and hence, as a matter of ordinary business prudence, would feel obliged to keep his patent monopoly wholly within his own hands. And it was so held in *Bement* v. *National Harrow Co.*, 186 U. S. 70, 22 S. Ct. 747, 46 L. Ed. 1058." *United States* v. *General Electric Co.*, 15 F. 2d 715, 718.

[23] *General Electric* case, *supra*, at p. 490.

[24] Hearings before the Temporary National Economic Committee, *supra;* Conway P. Coe, Commissioner of Patents, pp. 839, *et seq.*, 857,

In cases where patents are owned by comparatively small industrial producers but licenses are to be issued by them to comparatively large industrial producers in the same field, the necessity for early reimbursement of the patent owners for their development costs is clear and the danger that a large licensee will undersell his smaller licensor is obvious. This is the situation in the present case. The General Electric Company and the Westinghouse Electric Corporation are among the licensees of the much smaller patent holders, Line and Southern. Similarly, where outside capital is needed to finance the development of an invention, it is normal and reasonable for the investors to require not only a valid patent but also to insist that any licenses issued during the initial operating period shall contain such price limitations as will allow the patent holder to amortize his original investment within a reasonable time. In this case, finding of fact No. 32 shows that "The price limitation provisions contained in the various license agreements here in evidence were insisted upon by the patent owner and were intended and reasonably adapted to protect its own business and secure pecuniary reward for the patentee's monopoly." [25]

The following statement by Conway P. Coe, Commissioner of Patents, before the Temporary National Eco-

*et. seq.;* I. Joseph Farley, Patent Counsel, Ford Motor Co., Detroit, Michigan, p. 262, *et seq.;* Dr. Vannevar Bush, President, Carnegie Institution, Washington, D. C., p. 898, *et seq.;* Ralph E. Flanders, President, Jones & Lamson, Springfield, Vermont (now U. S. Senator from Vermont), p. 928, *et seq.;* John A. Graham, President, Motor Improvements, Inc., Newark, New Jersey, p. 938, *et seq.;* Dr. Frank B. Jewett, President, Bell Telephone Laboratories, Inc., New York City, p. 958, *et seq.;* Maurice H. Graham, Independent Inventor, Minneapolis, Minnesota, p. 1076, *et seq.;* and George Baekeland, Vice President, Bakelite Corporation, New York City, p. 1082, *et seq.*

[25] See note 3, *supra.*

nomic Committee in 1939, reinforces the above conclusions:

> "Speculative capital must be encouraged to fall in behind a new enterprise and this is true whether the enterprise is wholly new or represents merely an expansion of an established organization. Some testimony has been offered to this committee by representatives of large corporations that they would continue to invent, and invent, and invent, and research, research, and research whether or not they were rewarded by the patent grant, but, if you will investigate, I believe you will find that whenever these large corporations, themselves firmly established, undertake a new development, that development is likely to be founded upon patent protection. Whatever opinions have been expressed to this committee or may hereafter be expressed as to whether or not the inventor will continue to invent without the patent system, I think I can present to you indisputable evidence that speculative capital will not back new inventions without the patent protection. And in the final analysis this is the crux and the most important thing in the whole patent question." [26] Hearings before the Temporary National Economic Committee, *supra,* at pp. 857–858.

---

[26] In 1939, the Commissioner of Patents testified that of the patents issued, exclusive of design patents and reissues, large corporations (having respectively over $50,000,000 of assets) received but 17.2%, small corporations (having respectively less than $50,000,000 of assets) 34.5%, foreign corporations 5.4% and individuals 42.9%. Subsequent assignments did not materially affect these proportions. Hearings before the Temporary National Economic Committee, *supra,* at p. 846.

Clarence C. Carlton, president of the Automotive Parts and Equip-

The foregoing supports the conclusions reached in the *Bement* and *General Electric* cases, *supra.* The basis for such support is sufficiently broad to lead to the same result in the present case.

### SUBLICENSES AND CROSS-LICENSES.

Under the foregoing principles and authorities, a simple price-limiting patent license, in which the price limitations meet the test stated in the *General Electric* case, is a lawful agreement. Such a license would involve, as a possible restraint of trade, only the exclusive right to make, use and sell the patented product. That restraint would exist by virtue of the statute and constitutional provision long antedating the Sherman Act. If the limitations in a license reach beyond the scope of the statutory patent rights, then they must be tested by the terms of the Sherman Act. Assuming that in the instant case the price limitations do not reach beyond the restraint of the patent, the next question is: does the additional sublicense issued by Line under the Southern patent make a difference? The answer is no.

The sublicense, *per se, further diminishes* the statutory restraint of trade imposed by the patent law. It adds a release from the restraint of Southern's patent. Line's authority to issue the sublicense was an express grant by Southern to Line of an exclusive right to issue it. *Per se,* this sublicense certainly amounts to no more than another license under another patent. In the in-

---

ment Manufacturers Association, testified that in the automotive parts industry:

> "Patents are valued so much more by the small manufacturer than they are by the large manufacturer. . . . if anything happened to this patent system the fellow who would be hurt more than anyone else would be the smaller manufacturer." (*Id.* at pp. 1057, 1058.)

stant case it is under a complementary patent without which Line's license would be without commercial value. For that very reason it is a reasonable and necessary part of the transaction. In both the *Bement* and *General Electric* cases, the license in question was issued not merely under one, but under many patents held by the licensor. In those cases, apparently, it was not thought necessary to question the relation of those patents to one another or the authority of the licensor to issue the license under each of them. In any event, there hardly could have existed in those cases any closer relationship between the patents involved or a more essential and normal reason, of a patent nature, for combining rights under them than existed here between Line's and Southern's complementary patents. Except for the cross-licensing feature, to be next considered, the situation in relation to the Sherman Act is the same here as though Line had received an assignment of Southern's patent and issued licenses under it as well as under Line's patent.

In the present case, there are ten licensee-defendants instead of one as in each of the *Bement* and *General Electric* cases. In view of the positive finding that there was no agreement or understanding among the licensees amounting to an unreasonable restraint of trade, this mere multiplication of one license by ten produces a repetition of the same issue rather than a different issue. It is apparent also from the record in the *General Electric* case that, in that case, in addition to the Westinghouse license, there were licenses to 13 other manufacturers, which had been issued by the licensor, although the licensees under them were not made parties to the suit. 15 F. 2d 715, 716.

It is suggested also that the *Bement* and *General Electric* rule does not apply because there is a cross-licensing agreement between Line and Southern. The suggestion apparently is that such an agreement, *per se*, reaches

beyond the scope of the exclusive rights of the parties under the patents and converts the price limitations in the respective licenses into unreasonable restraints of trade violating the Sherman Act.

The cross-license from Southern carries no price-limiting feature. At most it is a royalty-free cross-license issued to Line in consideration of Line's license to Southern. It is accompanied by a grant from Southern to Line of an exclusive license to grant sublicenses under Southern's patent. Provision is made also for the equal division between Southern and Line of such royalties as shall be received by Line upon products made and sold by the respective licensees under the Southern and Line patents.

These sublicenses and the royalties derived from them do not, however, increase the restraints on trade beyond those restraints which are inherent in the respective patents. In fact, each original license decreased those restraints under Line's patent and each sublicense did the same under Southern's patent. Because of the complementary relationship between the patents, these sublicenses have served substantially to remove the restraints which the respective patents, when held separately, put in the way of production. The two patents together completely covered the product. If the price limitations were valid under Line's licenses, the issuance by Line of the sublicenses under Southern's patent has no more effect on the question involved in this case than if Southern, instead of granting to Line an exclusive right to issue sublicenses under Southern's patent, had assigned that patent to Line and Line had then issued original licenses under it on the same terms as Line issued the sublicenses.

The next consideration is the effect of the cross-license by Southern to Line, coupled with the grant of the exclusive right to issue the above-mentioned sublicenses under

Southern's patent and the division of certain royalties received by Line. Where, as here, there is no agreement, course of dealing or other circumstance than the existence of the cross-licenses between complementary patent holders, the cross-licensing agreements do not, *per se,* reach beyond the scope of the patent rights.

Patent pools, especially those including unrelated or distantly related patents and involving the issuance of many forms of royalty-free, royalty-bearing or price-limiting licenses and cross-licenses, might present a different picture from that in this case. Such arrangements might be but a screen for, or incident to, an unlawful agreement in restraint of trade violating the Sherman Act. Here we have no such facts. The findings eliminate all bases for the claim of invalidity except the terms of the license agreements, *per se.* We are not here confronted with the effect of cross-licenses between unrelated patents. Here we have only that natural situation, common under our patent laws, where two or more complementary patents are separately owned. One is for an improvement that is commercially essential to the other. In such a case one solution is to combine the ownership of the two by purchase and complete assignment. That, *per se,* would not involve an unlawful restraint of trade.

The solution in the instant case was even more natural than a consolidation of the patents by purchase. It conduced even more to the maintenance of competition. Each patentee granted to the other a nonexclusive, royalty-free license. This cross-licensing amounted to a waiver by each patent holder of his right to exclude the other from making, using or selling the patented product. This resulted in a diminution of the restraint created by the patent statute. This, *per se,* was, therefore, well within the scope of the patent and not a violation of the Sherman Act. Both patentees became producers.

Unless the terms of the cross-licenses reach beyond those that are normally and reasonably adapted to the patent relationships of the parties, the cross-licenses are no more outside of the protection of the patent law than would be direct licenses. A reasonable price-limiting provision in at least one of two cross-licenses is just as normal and reasonable a patent provision as it would be in a direct license. In the present case the validity of the price limitation in Line's license to Southern is entitled to the same judicial support and for the same reasons as if no cross-license had been issued in exchange.

In the present case, the need for the price-limiting provisions, both in the license to Southern and in the licenses to the other ten defendants, rests upon the need of the patent holder to protect its opportunity to continue the manufacture of its own patented product. The substance of the situation is that the patent holder needs to protect itself precisely as much and in the same way as in the case of a direct license standing alone. The Sherman Act traditionally tests its violation not by the form but by the substance of the transaction.

In distinction from patent pools and from cross-licenses between holders of competing or even noncompeting but unrelated patents, we have here a case of a cross-license and a division of royalties between holders of patents which are complementary and vitally dependent upon each other. We have here complementary patents each of which alone is commercially of little value, but both of which, together, spell commercial success for the product. Cross-licenses between their holders, on terms within the needs of their patent monopolies, are essential to the realization of the benefits contemplated by the patent statutes. Far from being unlawful agreements violative of the Sherman Act, such agreements pro-

vide in fact the only reasonable means for releasing to the public the benefits intended for the public by the patent laws. A cross-license between mutually deadlocked complementary patents is, *per se*, a desirable procedure. *Standard Oil Co.* v. *United States,* 283 U. S. 163, 170, *et seq.* Its validity must depend upon the terms and substance of the surrounding circumstances.

The record in the *General Electric* case discloses that the license agreement between the General Electric Company and Westinghouse which was there upheld was itself a cross-licensing agreement.[27] In fact, the opinion of the lower court in the instant case commented on that cross-license as follows:

"A cross-license agreement existed between General Electric and Westinghouse which contained agreements even more restrictive than the price pro-

---

[27] "As a part consideration for the granting of the foregoing licenses, the Licensee [Westinghouse] hereby grants and agrees to grant to the Licensor [General Electric] a non-exclusive license under the United States patents which it now owns or controls and under those which may issue on pending applications now owned or controlled by it, and under any United States patents which the Licensee may own or control, during the term of this agreement, for improvements in incandescent lamps specified in paragraphs *a, b, c* and *d* of Article 2, to make, use and sell throughout the United States and the territories thereof incandescent lamps of the kinds specified in said paragraphs of Article 2 hereof, such license being personal, non-assignable, indivisible and non-transferable except to successors to substantially the entire good will and business of the Licensor, and to continue for the period during which the licenses from the Licensor to the Licensee remain in force." Par. (8) of Agreement between General Electric Company and Westinghouse Electric & Manufacturing Company, March 1, 1912, Exhibit A, at p. 117 of the record in the Supreme Court of the United States, No. 113, O. T. 1926.

tection provisions of the cross-licenses involved in the case at bar." *United States* v. *Line Material Co.,* 64 F. Supp. 970, 975.

The opinion in the *General Electric* case makes no distinction between cross-licenses and direct licenses. That case, therefore, is itself a precedent for upholding a cross-licensing agreement under facts characterized below as being "even more restrictive" than those here presented.

The acquisition by a single party of patents on noncompeting machines has been held not to be, *per se,* a violation of the Sherman Act. In *United States* v. *Winslow,* 227 U. S. 202, 217, Mr. Justice Holmes, in a unanimous opinion of the Court, said:

"The machines are patented, making them is a monopoly in any case, the exclusion of competitors from the use of them is of the very essence of the right conferred by the patents, *Paper Bag Patent Case,* 210 U. S. 405, 429, and it may be assumed that the success of the several groups was due to their patents having been the best. As, . . . they did not compete with one another, it is hard to see why the collective business should be any worse than its component parts. . . . we can see no greater objection to one corporation manufacturing seventy per cent. of three noncompeting groups of patented machines collectively used for making a single product than to three corporations making the same proportion of one group each. The disintegration aimed at by the statute does not extend to reducing all manufacture to isolated units of the lowest degree."

See also, *United States* v. *United Shoe Mach. Co.,* 247 U. S. 32, 45, 51, *et seq.; United Shoe Mach. Co.* v. *United States,* 258 U. S. 451, 463–464.

In *Standard Oil Co.* v. *United States,* 283 U. S. 163, 170–171, 175, Mr. Justice Brandeis spoke as follows for

a unanimous Court (except for Mr. Justice Stone who took no part in the case):

"The Government concedes that it is not illegal for the primary defendants to cross-license each other and the respective licensees; and that adequate consideration can legally be demanded for such grants. But it contends that the insertion of certain additional provisions in these agreements renders them illegal. It urges, first, that the mere inclusion of the provisions for the division of royalties, constitutes an unlawful combination under the Sherman Act because it evidences an intent to obtain a monopoly. This contention is unsound. Such provisions for the division of royalties are not in themselves conclusive evidence of illegality. Where there are legitimately conflicting claims or threatened interferences, a settlement by agreement, rather than litigation, is not precluded by the Act. . . . An interchange of patent rights and a division of royalties according to the value attributed by the parties to their respective patent claims is frequently necessary if technical advancement is not to be blocked by threatened litigation.[28] . . .

. . . . .

"But an agreement for cross-licensing and division of royalties violates the Act only when used to effect a

---

[28] In that *Standard Oil* case the footnote at this point stated (p. 171):

"This is often the case where patents covering improvements of a basic process, owned by one manufacturer, are granted to another. A patent may be rendered quite useless, or 'blocked,' by another unexpired patent which covers a vitally related feature of the manufacturing process. Unless some agreement can be reached, the parties are hampered and exposed to litigation. And, frequently, the cost of litigation to a patentee is greater than the value of a patent for a minor improvement."

monopoly, or to fix prices, or to impose otherwise an unreasonable restraint upon interstate commerce."

In the above context, and for the reasons previously presented, it is evident that the agreements effecting a price fixation which thus may violate the Sherman Act are only those which "impose . . . an unreasonable restraint upon interstate commerce," within the meaning of the Sherman Act read in the light of the patent laws.[29] The agreements which remain within the ambits of the patents to which they relate still are lawful agreements by virtue of the patent laws, just as they have been throughout the life of our patent system.

### JUDICIAL AND LEGISLATIVE HISTORY SINCE THE GENERAL ELECTRIC CASE.

Neither the *Bement* nor the *General Electric* case, *supra,* has been overruled and the reasoning upon which they are based has not been directly or indirectly rejected by this Court. On the other hand, this Court repeatedly has recognized the existence of the principles announced in them. See, for example, *Carbice Corp.* v. *American Patents Development Corp.,* 283 U. S. 27, 31; *General Talking Pictures Corp.* v. *Western Electric Corp.,* 305 U. S. 124, 127:

"Appellants argue that the distributors were free to license the films for exhibition subject to the restrictions, just as a patentee in a license to manufacture and sell the patented article may fix the price at which the licensee may sell it." (Citing the *Bement* and *General Electric* cases.) *Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208, 228.

[29] Before making this statement, Mr. Justice Brandeis already had joined in the opinion of the Court in the *General Electric* case, *supra,* and written the opinion in *Carbice Corp.* v. *American Patents Development Corp.,* 283 U. S. 27.

And see *United States* v. *Univis Lens Co.,* 316 U. S. 241, 252; *United States* v. *Masonite Corp.,* 316 U. S. 265, 277.

The rule of *stare decisis* applies to the interpretation given to the patent statutes and to the Sherman Act by the *Bement* and *General Electric* cases. There is no occasion here for such a relaxation of that rule as was suggested by Mr. Justice Brandeis in cases interpreting broad constitutional phrases. See his dissent in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 410. To the extent that the present holdings are based upon opinions of this Court, that element is inherent in the rule of *stare decisis.*

The exceptional recent activity in seeking, by statutory amendment, a change in the patent laws as interpreted in the *Bement* and *General Electric* cases indicates a widespread understanding that, if such interpretation is to be changed, the remedy calls for congressional action. The resistance to such a change which has been shown by Congress is impressive.[30] It indicates no dissatisfac-

---

[30] Many bills relating to these issues have been introduced in Congress and referred to appropriate committees. Not one has been reported back to either House of Congress.

As early as 1912, H. R. 22345, 62d Cong., 2d Sess., proposed that a patentee be not permitted to fix the price of articles to be sold by others under his patent.

During the hearings held by the Temporary National Economic Committee, the Department of Justice recommended many fundamental as well as minor changes in the patent law. These included the prohibition of price-limiting patent licenses comparable to those here at issue. Preliminary Report, Temporary National Economic Committee, Sen. Doc. No. 95, 76th Cong., 1st Sess. 16–17 (1939). The Department of Commerce took an opposite position. It submitted recommendations for retaining but improving the patent system substantially in accordance with its traditional underlying policies. The Final Report of the Temporary National Economic Committee incorporated the substance of the proposals of the De-

tion with the interpretation of existing law as expressed in the *Bement* and *General Electric* cases.

There appears, therefore, to be neither adequate reason nor authority for overruling the *Bement* and *General Electric* cases or for distinguishing this case from them.

---

partment of Justice. It included a recommendation that patentees be not permitted to limit the price at which a licensee might sell a product made under the license. Final Report, Temporary National Economic Committee, Sen. Doc. No. 35, 77th Cong., 1st Sess. 36–37 (1941).

In 1941, the President appointed the National Patent Planning Commission to submit recommendations on questions dealt with in the report. (See note 12, *supra.*) In 1943, among the examples of the proposed reforms which it concluded "would not be a beneficial innovation in our patent system," it listed "outlawing certain limitations in patent licenses, . . . ." This evidently referred to the above-mentioned proposals of the Temporary National Economic Committee to outlaw price restrictions and other limitations in patent licenses. Report of the National Patent Planning Commission, H. R. Doc. 239, 78th Cong., 1st Sess. 9 (1943).

Bills to the same general effect as the proposals of the Temporary National Economic Committee have been introduced and referred to Committees of Congress but have advanced no further. Among them have been the following:

S. 2491 (§ 4), S. 2730 (§ 3), H. R. 7713 (§ 3), 77th Cong., 2d Sess. (1942); H. R. 109 (§ 3), H. R. 1371 (§ 29), H. R. 3874 (§ 29), 78th Cong., 1st Sess. (1943); H. R. 97 (§ 29), H. R. 3462 (§ 29), 79th Cong., 1st Sess. (1945); S. 2482, 79th Cong., 2d Sess. (1946); S. 72, 80th Cong., 1st Sess. (1947). Section 3 of S. 2730, *supra,* proposed that—

"Every sale, assignment, or conveyance of a patent and every grant of a license thereunder, in connection with any condition, agreement, or understanding which restricts the price at which the purchaser, assignee, grantee, or license [licensee] may sell any article producible under the patent and customarily marketed in interstate commerce, is hereby declared to be illegal."